**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

M.M.V., et al.,                                )
                                               )        No. 19-cv-02773
              Plaintiffs,           )
                                               )
v.                                             )
                                               )
WILLIAM P. BARR, Attorney General of           )
The United States; et al.,                     )
                                               )        Hon. Amy Berman Jackson
Defendants.                                    )


**PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF
MOTION FOR TEMPORARY RESTRAINING ORDER**

# TABLE OF CONTENTS

Page

I.    Introduction .................................................................................................. 1

II.   Procedural and Jurisdictional Arguments ........................................................... 2

      A.    Defendants Cannot Evade Review by Acting Without Written Authorization .............. 2

            1.    A Strong Presumption of Judicial Review Applies to Plaintiffs' Claims ................ 3

            2.    Defendants Misstate the Scope and Application of 8 U.S.C. § 1252 ...................... 4

            3.    Defendants Rely on Cases that Did Not Address the Above Issues ........................ 8

      B.    Plaintiffs Have Satisfied § 1252(e)(3) to the Extent It Applies Here .............................. 9

            1.    Plaintiffs Filed Within 60 Days of Implementation ................................................ 10

            2.    Defendants Cannot Rely on Secret, Non-public Writings to Bar Claims ............... 10

            3.    The 60-Day Period in § 1252(e)(3)(B) Is Subject to Equitable Tolling.................. 12

            4.    A 60-Day Limit Does Not Apply to Actions Taken or "Authorized" by
                  Defendant Cuccinelli, or by DHS Acting Secretaries McAleenan or Wolf........... 15

      C.    Relief Can Be Granted Equally as to Later Added Plaintiffs ......................................... 17

      D.    Defendants Have Not Produced All Relevant Policies and Directives.......................... 18

III.  The Merits of Plaintiffs Claims and the Challenged Actions ................................................ 21

      A.    Defendants Cannot Ignore the Statutory or Regulatory Requirements ......................... 21

      B.    Plaintiffs Are Likely to Prevail on All Challenged Actions .......................................... 22

      C.    Defendants Declaration Does Not Provide Any Contrary *Evidence* ............................ 24

      D.    Plaintiffs Will Be Irreparably Harmed If Relief Is Not Granted .................................. 25

      E.    Plaintiffs Are Entitled to Relief Against Each of the Challenged Actions .................... 26

            1.    Defendants Failure to Meaningfully Orient Migrants............................................. 26

            2.    Defendants Proceed Without Required Staffing, Training, or Guidance................ 27

            3.    Defendants Issue Summary Negative Determinations to Eliminate Supervisory
                  Review and to Avoid Developing a Complete Written Record ............................. 29

**TABLE OF CONTENTS**
(continued)

Page

4.   Defendants Limit Fact-finding Relevant to a Significant Possibility of
     Eligibility for Asylum, Withholding of Removal, and Relief Under the
     Convention Against Torture ................................................................................. 31

5.   Defendants Make Interviews Adversarial ................................................................ 32

6.   Defendants Limit Migrants' Rights to Consultation ................................................ 35

7.   Defendants Apply RFI Standards Without RFI Protections ..................................... 36

8.   Defendants Do Not Apply the Most Favorable Precedent in CFI Proceedings
     (i.e., violating Grace v. Whitaker).......................................................................... 37

9.   Defendants Imposed Mandatory Review by the Fraud Detection Unit .................. 37

10.  Defendants Withhold Facts Relied Upon in Issuing the Credible Fear
     Determination......................................................................................................... 39

11.  Defendants Abandoned Child-Sensitive Treatment Interviews .............................. 39

IV.  Conclusion ..................................................................................................................... 41

# TABLE OF AUTHORITIES

Page

**Cases**

*Abbot Labs. v. Gardner*,
    387 U.S. 136 (1967) ............................................................................................6

*United States ex. rel. Accardi v Shaughnessy*,
    347 U.S. 260 (1954) ..........................................................................................21

*AILA v. Reno*,
    18 F. Supp. 2d 38 (1998) ...............................................................................7, 14

*Am. Immigration Council v. U.S. Customs and Border Protection*,
    No. 1:19-cv- 02965, (D.D.C. Oct. 2, 2019) ....................................................20

*Battle v. FAA*,
    393 F.3d 1330 (D.C. Cir. 2005) ........................................................................21

*Bd. of Governors of the Fed. Reserve Sys. v. MCorp. Fin., Inc.*,
    502 U.S. 32 (1991) ..............................................................................................4

*Chamber of Commerce of U.S. v. Reich*,
    74 F.3d 1322 (D.C. Cir. 1996) ...........................................................................4

*Clark v. Martinez*,
    543 U.S. 371 (2005) ............................................................................................7

*Comcast Corp. v. F.C.C.*,
    579 F.3d 1 (D.C. Cir. 1993) .............................................................................18

*Crowell v. Benson*,
    285 U.S. 22 (1932) ..............................................................................................9

*Damus v. Nielsen*,
    313 F. Supp 3d 317 (D.D.C. 2018) .......................................................21, 23, 38

*EPA v. EME Homer City Generation, L.P.*,
    572 U.S. 489 (2014) ..........................................................................................13

*Fort Bend Cnty. v. Davis*,
    139 S. Ct. 1843 (2019) ......................................................................................13

*Gonzalez v. Thaler*,
    565 U.S. 134 (2012) ..........................................................................................13

*Grace v. Whitaker*,
    344 F. Supp. 3d 96 (D.D.C. 2018) ............................................................3, 6, 17

# TABLE OF AUTHORITIES
(continued)

Page

*Henderson v. Shinseki,*
    562 U.S. 428 (2011) .................................................................................................12, 13

*INS v. Cardoza-Fonseca,*
    480 U.S. 421 (l987) .........................................................................................................6

*INS v. Errico,*
    385 U.S. 214 (1966) .........................................................................................................7

*INS v. St. Cyr.*
    533 U.S. 289 (2001) .........................................................................................................3

*Irwin v. Dep't of Veterans Affairs,*
    498 U.S. 89 (1990) .........................................................................................................12

*Johnson v. District of Columbia,*
    850 F. Supp. 2d 74 (D.D.C. 2012) ..................................................................................8

*Khan v. Holder,*
    608 F.3d 325 (7th Cir. 2010) ..........................................................................................7

*United States ex rel. Knauff v. Shaughnessy,*
    338 U.S. 537 (1950) ....................................................................................................7, 20

*L.M.-M. v. Cuccinelli,*
    1:19-cv- 02676 (D.D.C. Sept. 6, 2019) ........................................................................15

*Mach Mining, LLC v. EEOC,*
    575 U.S. 480 (2015) .........................................................................................................4

*Make the Road N.Y. v. McAleenan,*
    405 F. Supp. 3d 1 (D.D.C. 2019) .......................................................................4, 5, 6, 12

*Marbury v. Madison,*
    5 U.S. 137 (1803) .......................................................................................................9, 18

*Martin v. Hunter's Lessee,*
    14 U.S. 304 (1816) ...........................................................................................................9

*Morton v. Ruiz,*
    415 U.S. 199 (1974) .......................................................................................................21

*Musacchio v. United States,*
    136 S. Ct. 709 (2016) .....................................................................................................14

# TABLE OF AUTHORITIES
(continued)

Page

*Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*,
 145 F.3d 1399 (D.C. Cir. 1998) ........................................................................................18

*In re Navy Chaplaincy*,
 697 F.3d 1171 (D.C. Cir. 2012) ........................................................................................17

*New Jersey v. T.L.O.*,
 469 U.S. 325 (1985) ..........................................................................................................34

*O.A. v. Trump*,
 404 F. Supp. 3d 109 (D.D.C. 2019) ..................................................................................16

*Padilla v. ICE*,
 2019 WL 7486849 (W.D. Wash. Feb. 12, 2019) ................................................................2

*Ramirez v. U.S. Customs and Border Protection*,
 477 F. Supp. 2d 150 (D.D.C. 2007) ..................................................................................24

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*,
 547 U.S. 47 (2006) ............................................................................................................17

*Sebelius v. Auburn Reg'l Med. Ctr.*,
 568 U.S. 145 (2013) ....................................................................................................12, 13

*United States v. Kwai Fun Wong*,
 135 S. Ct. 1625 (2015) ................................................................................................12, 13

*Webster v Doe*,
 486 US 592 (1988) ..............................................................................................................6

*Weyerhaeuser Co. v. United States Fish and Wildlife Servs.*,
 586 U.S. ——, ——, 139 S. Ct. 361 (2018) ........................................................................4

*Zadvydas v. Davis*,
 533 U.S. 678 (2001) ..........................................................................................................16

*Zipes v. Trans World Airlines, Inc.*,
 455 U.S. 385 (1982) ..........................................................................................................13

**Statutes**

5 U.S.C. § 555 ..............................................................................................................................33

5 U.S.C. § 706 ..................................................................................................................20, 21, 22

# TABLE OF AUTHORITIES
(continued)

Page

5 U.S.C. § 3345 .................................................................................................................14

5 U.S.C. § 3348 ..................................................................................................15, 21, 22

8 U.S.C. § 1225 ...............................................................................................................22

8 U.S.C. § 1252 .......................................................................................................2, 5, 6, 9

28 U.S.C. § 1331 ........................................................................................................3, 15

28 U.S.C. § 1346 ........................................................................................................3, 15

28 U.S.C. § 2201 ........................................................................................................3, 15

28 U.S.C. § 2202 ........................................................................................................3, 15

**Regulations**

8 C.F.R. § 208.1 ..............................................................................................................26

8 C.F.R. § 208.2 ......................................................................................................21, 26

8 C.F.R. § 208.30 ....................................................................................25, 28, 33, 36

8 C.F.R. § 208.31 ......................................................................................................33, 34

8 C.F.R. § 235.3 ..............................................................................................................28

84 Fed. Reg. at 33,837-38 .............................................................................................29

**Rules**

Fed. R. Evid. 602 ...........................................................................................................18

Fed. R. Evid. 802 ...........................................................................................................18

**Constitutional Provisions**

U.S. Const., Amend. I .....................................................................................................33

U.S. Const. art. II, § 2, cl. 2 ..........................................................................................14

**Other Authorities**

142 Cong. Rec. S11,491 (daily ed. Sept. 27, 1996) ................................................11, 14

# TABLE OF AUTHORITIES
(continued)

Page

A.C. Thompson, *Inside the Secret Border Patrol Facebook Group Where Agents Joke About Migrant Deaths and Post Sexist Memes*, ProPublica (July 1, 2019*), available at* https://www.propublica.org/article/secret-border-patrol-facebook-group-agents-joke-about-migrant-deaths-post-sexist-memes ................................................. 32

Akhil Reed Amar, *A Neo-Federalist View of Article III: Separating the Two Tiers of Federal Jurisdiction*, 65 BU L Rev 205 (1985) ..................................................... 8

Akhil Reed Amar, *The Two-Tiered Structure of the Judiciary Act of 1789*, 138 U Pa L Rev 1499 (1990) ............................................................................................. 8

Ashley Caudill-Mirillo, *Laws of Hospitality: Asylum and Refugee Law Panel*, at 3 (May 2011), *available at* https://villagillet.files.wordpress.com/2011/05/caudill-mirillo_ashley_en.pdf ..... 26, 27, 28, 31

*Children's Claims Training Course*, at 26–37 (May 11, 2017 update) (interviewing guidance), *available at* https://www.aila.org/File/DownloadEmbeddedFile/72289 ................................... 37

https://www.hsdl.org/?abstract&did=19629 (Dec. 10, 1998 Guidelines For Children's Asylum Claims Memorandum) ............................................................. 37

Human Rights First, *Crossing the Line: U.S. Border Agents Illegally Reject Asylum Seekers* (2017), *available at* https://www.humanrightsfirst.org/sites/default/files/hrf-crossing-the-line-report.pdf; ............................................................................................................ 32

Jay Willis, *Stephen Miller Is Trying to Break the Asylum Process*, GQ (July 30, 2019), *available at* https://www.gq.com/story/asylum-border-patrol-interviews ................................................................................................................ 32

Jerrold Nadler, Chairman, House Comm. on the Judiciary, et al. to Acting Secretary of Homeland Security Kevin K. McAleenan, available at https://judiciary.house.gov/sites/democrats.judiciary.house.gov/files/documents/06-18-2019%20Letter%20to%20Acting%20Secretary%20McAleenan.pdf ....................... 15

John Washington, *Bad Information: Border Patrol Arrest Reports Are Full of Lies That Can Sabotage Asylum Claims*, the Intercept (Aug. 11, 2019), *available at* https://theintercept.com/2019/08/11/border-patrol-asylum-claim/ .......................... 32

Letter from Democracy Forward et al. to Att'y Gen. William Barr & U.S. Att'y Jessie K. Liu (July 22, 2019), *available at* https://democracyforward.org/wp-content/uploads/2019/07/Cuccinelli-Letter.pdf; ...................................................... 15

# TABLE OF AUTHORITIES
(continued)

Page

Letter of from H.R. Committee on Homeland Security and Committee on
    Oversight and Reform to Comptroller General of the United States (Nov. 15,
    2019), *available at*
    https://oversight.house.gov/sites/democrats.oversight.house.gov/files/191115
    %20T%20Dodaro%20re%20Letter%20to%20GAO%20on%20Wolf-
    Cuccinelli%20Appointment.pdf ........................................................................................15

Letter from Protect Democracy & Constitutional Accountability Ctr. to Acting
    Sec'y of Homeland Sec. Kevin McAleenan & Acting Dir. of USCIS Kenneth
    T. Cuccinelli (July 30, 2019), *available at*
    https://protectdemocracy.org/resource-library/document/cuccinelli-
    appointment-letter/ ..............................................................................................................15

Robert N. Clinton, *A Mandatory View of Federal Court Jurisdiction: A Guided
    Quest for the Original Understanding of Article III*, 132 U Pa L Rev 741
    (1984) ....................................................................................................................................8

Robert N. Clinton, *A Mandatory View of Federal Court Jurisdiction: Early
    Implementation of and Departures from the Constitutional Plan*, 86 Colum L
    Rev 1515 (1986) ...................................................................................................................8

USCIS Policy Manual, *Appendix 15-2 Non-Adversarial Interview Techniques*,
    https://www.uscis.gov/ilink/docView/AFM/HTML/AFM/0-0-0-1/0-0-0-
    26573/0-0-0-28729.html .....................................................................................................32

## I.    <u>INTRODUCTION</u>

On December 18, 2019, the Court directed government counsel to disclose "any written directives" and "follow-up guidance" relevant to the case.  Tr. at 88.  The Court explained that "there's no reason to not make it part of your next submission."  *Id*.  Disclosure of the disputed government directives and guidance is critical to this case.  Yet, rather than disclose these materials, much of Defendants' next submission—their supplemental opposition to a temporary restraining order, filed on December 27, 2019—now relies on the notion that "no such" directives exist, based solely on the conclusory assertions of a Deputy Director in the Asylum Office (who does not work at CBP, ICE, or in DHS leadership above the agency level).  *See* Defs. Supp. Op. at 11, 13, 17, 26, 27 (citing Caudill-Mirillo Decl.).  Notably, the declarant herself lacks personal knowledge of whether her assertions are true.

Further, Ms. Caudill-Mirillo's declaration, which refers to documents that have not been produced, only confirms that Defendants have withheld and continue to withhold evidence relevant to the Court's jurisdiction. At a minimum, Defendants have admitted that at least one of the challenged actions was the result of a written policy enacted and implemented within the statutory period. Defendant's evidence provides further proof that said changes not only occurred but were memorialized and implemented subjecting those directives to judicial review pursuant to 8 U.S.C. § 1252(e)(3). Plaintiffs have thus met their burden.

Plaintiffs attach substantial testimony and evidence that give rise to a strong inference of the existence of written policies, procedures, directives, instructions, trainings and other materials that have not been produced. *See* Supplemental Declaration of Shalyn Fluharty, with Exhibits. However, Defendants claim that many of the actions Plaintiffs challenge were allegedly implemented without being memorialized in writing.  Per Defendants' argument, so long as Defendants act without a writing, the Court lacks power to review their actions, even if those

1

actions are illegal or unconstitutional.   Similarly, to the extent written directives exist for Defendants actions, several such writings were issued by the government in secret and not made public.   Per Defendants, these policies are now beyond judicial review. This is wholly incorrect.

Defendants cannot evade judicial review merely by acting without committing their actions to writing, or by maintaining secrecy over their actions to later contend that claims are stale.   To make these arguments, Defendants misinterpret the reach of 8 U.S.C. § 1252, which limits the scope of review in specific circumstances, so as to stretch that provision beyond its textual or constitutional bounds.   But to the extent § 1252 applies to Plaintiffs' claims, Plaintiffs have complied with its requirements as properly construed.   Plaintiffs' claims are not barred by that, or any other, statute.

As Plaintiffs' submissions reflect, Plaintiffs have a likelihood of success in proving that the Challenged Actions underlying their claims violate the law and their constitutional rights. *See* 2d. Am. Compl. ¶¶ 147–161.   Plaintiffs will continue to suffer irreparable harm unless the Challenged Actions stop.   Plaintiffs are thus entitled to the requested orders of restraint.

## II.   PROCEDURAL AND JURISDICTIONAL ARGUMENTS

### A.   Defendants Cannot Evade Review by Acting Without Written Authorization

For many Challenged Actions underlying Plaintiffs' claims, Defendants do not dispute the fact that the challenged conduct occurred.   Instead, the government relies on the false premise that there is no jurisdiction to stop those actions because the government and its agents have allegedly engaged in the conduct without written authorization (i.e., without "a written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General").   *See, e.g.*, Defs. Supp. Op. at 25 (citing 8 U.S.C. § 1252(e)(3)(A)(ii)). According to Defendants, so long as the government or its agents act outside the law or violate

the constitutional rights of migrants *without* formal written authorization of the Attorney General, they can do so with impunity, and without risk of or remedy from judicial review.

This notion is false. The government cannot avoid judicial review by acting in secret or by failing to formally memorialize its illegal conduct. As one court recently held rejecting this same argument: "Were the Court to adopt Defendants' reasoning, the government could insulate itself from review merely by declining to … commit its policies to writing." *Padilla v. ICE*, 2019 WL 7486849, at *1 (W.D. Wash. Feb. 12, 2019) (rejecting that 8 U.S.C. § 1252(e)(3) barred judicial review because "[d]efendants ha[d] not adopted any formal procedure or policy").

As detailed below, Plaintiffs have alleged that written authorizations exist for *each* of the Challenged Actions, although Defendants have continued to refuse to disclose or produce all such writings and communications. But, as Plaintiffs have *also* alleged in the alternative, even in the unlikely event the Court finds that Defendants engaged in the Challenged Actions without written authorization, jurisdiction would still exist for Plaintiffs' claims under, *inter alia*, 28 U.S.C. §§ 1331, 1346, 2201, and 2202. *See* 2d Am. Compl. ¶¶ 8–9. Plaintiffs do not plead that jurisdiction here relies on or arises *solely* under 8 U.S.C. § 1252(e)(3). To the contrary, to the extent Plaintiffs' claims do not fall under § 1252(e)(3)—e.g., because Defendants acted without authorization or writing—Plaintiffs pleaded and still have jurisdiction for their claims. *E.g.*, 2d Am. Compl. ¶¶ 8–9. Section 1252 does not bar claims based on unauthorized or unwritten government action as Defendants propose. Thus, if Defendants actions were undertaken without written authorization, this Court still has jurisdiction to review them.

## 1. *A Strong Presumption of Judicial Review Applies to Plaintiffs' Claims*

There is a "strong presumption in favor of judicial review of administrative action." *INS v. St. Cyr.* 533 U.S. 289, 298 (2001). As the Supreme Court has made clear, "'legal lapses and violations occur, and especially so when they have no consequence. That is why [courts have

for] so long applied a strong presumption favoring judicial review of administrative action.'" *Weyerhaeuser Co. v. United States Fish and Wildlife Servs.*, 586 U.S. ——, ——, 139 S. Ct. 361, 370 (2018) (quoting *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 489 (2015)); *see also Grace v. Whitaker*, 344 F. Supp. 3d 96, 117 (D.D.C. 2018) (citing same to credible fear proceedings).

As courts in this District have recognized, this strong "presumption of reviewability" applies even if the challenged action does not fit the strict confines of review provided by statute. *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1327–28 (D.C. Cir. 1996). "Only with clear and convincing evidence of a contrary legislative intent should the courts restrict access to judicial review." *Bd. of Governors of the Fed. Reserve Sys. v. MCorp. Fin., Inc.*, 502 U.S. 32, 44 (1991) (citations and quotes omitted).

### 2.    Defendants Misstate the Scope and Application of 8 U.S.C. § 1252

Defendants argue that 8 U.S.C. § 1252 provides such clear and convincing evidence of a contrary legislative intent, but they are mistaken. On its face, § 1252 nowhere states that courts lack jurisdiction to address government action undertaken without authority, written or unwritten.

Defendants argue that this conclusion is implicit in § 1252(e), but they do so by treating subsection (e) as if it defined the universe of available judicial review concerning expedited removal. Section 1252(e) does no such thing. To the contrary, when § 1252 is read as a whole, it becomes clear that § 1252(a) identifies limitations on judicial review, while § 1252(e) serves as a saving provision that lists what is exempted from the limitations in § 1252(a). *See Make the Road N.Y. v. McAleenan*, 405 F. Supp. 3d 1, 26 (D.D.C. 2019) (§ 1252(a) is "more like a jurisdiction-*stripping* provision" and § 1252(e)(3) "is not couched in jurisdictional terms").

4

Specifically, § 1252(a)(2) begins by defining "Matters not subject to judicial review." It then, in subpart (A), lists four limitations pertinent to "Review relating to section 1225(b)(1)" (*i.e.*, the statutory provisions governing expedited removal).  As relevant here, § 1252(a)(2)(A) provides that "no court shall have jurisdiction to review— … (iv) except as provided in subsection (e), procedures and policies adopted by the Attorney General to implement the provisions of section 1225(b)(1) of this title."

Section 1252(a)(2)(A) further clarifies that its limitations apply "except as provided in subsection (e)."  By the plain terms of the statute, then, § 1252(e) describes what types of suits are permitted notwithstanding the limits on judicial review in § 1252(a)(2)(A).  The portion of § 1252(e) potentially relevant to this case provides that "[j]udicial review of determinations under section 1225(b) of this title and its implementation is available in an action instituted in the United States District Court for the District of Columbia, but shall be limited to determinations of … whether such a regulation, or a written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General to implement such section, is not consistent with applicable provisions of this subchapter or is otherwise in violation of law." 8 U.S.C. § 1252(e)(3)(A).

Given the interplay between § 1252(a) and § 1252(e), any analysis of whether this Court has jurisdiction here cannot, as Defendants would have it, begin with § 1252(e).  The initial question is instead whether the claims at issue are covered by the jurisdiction-limiting provisions of § 1252(a)(2)(A).  If they are not, this Court has jurisdiction, and § 1252(e) does not enter the analysis.  If, however, the claims are covered by § 1252(a)(2)(A), this Court has jurisdiction if the claims nevertheless fall within the exceptions set forth in § 1252(e).  This reading of the statute was confirmed by Judge Ketanji Brown Jackson in *Make the Road New York*, where the

court held that § 1252(a) "revoked the jurisdiction of the federal courts to consider certain claims [but not all claims] pertaining to the expedited removal process" and that "Subsection (e) thus operates as a carveout from subdivision (a)(2)'s jurisdiction- stripping function."  405 F. Supp. 3d at 27.

Here, the analysis ends at the first step, because, to the extent the Challenged Actions at issue were not authorized and/or formalized, Plaintiffs' claims are not covered by § 1252(a)(2)(A).  Statutory limits on judicial review or the jurisdiction of federal courts can only be found if there is a clear statement of congressional intent.  *See Abbot Labs. v. Gardner*, 387 U.S. 136, 140-41 (1967) ("clear and convincing evidence" of intent to restrict review required); *Webster v Doe*, 486 US 592, 601–05 (1988) (Congress did not intend to preclude review of constitutional claims as any such intent must be clear, as it would raise a "serious constitutional question").  And as noted above, § 1252(a)(2)(A) precludes judicial review *only* of "procedures and policies adopted by the Attorney General to implement the provisions of section 1225(b)(1) of this title." 8 U.S.C. § 1252(a)(2)(A)(iv).  The statute therefore cannot be read to limit judicial review of government actions that either **[1]** take some form other than procedures or policies adopted by the Attorney General or **[2]** do not implement the provisions of section 1225(b)(1).

Here, the government asserts that many of the Challenged Actions constitute unwritten actions taken without proper authorization and/or not purposed to implement § 1225(b)(1).  That assertion removes those actions from the ambit of § 1252(a)(2)(A): An unauthorized action cannot constitute a policy or procedure adopted by the Attorney General[1] at all, much less one that implements § 1225(b)(1).  Because § 1252(a)(2)(A) does not reach challenges to

---

[1] Per 6 U.S.C. § 557, implementation of § 1225(b)(1) procedures is now is entrusted to the authorization of the Secretary of Homeland Security.  *See* Defs. Supp. Op. at 12 n.2.

*unauthorized*, unwritten practices, this Court has jurisdiction over any such challenges, including under 28 U.S.C. §§ 1331, 1346, 2201, and 2202. *See* 2d Am. Compl. ¶¶ 8–9.

Even if § 1252 were ambiguous and could arguably support Defendants' position—and it cannot[2]—the result would be the same. A statutory ambiguity cannot yield clear and convincing evidence of intent required to limit review. Moreover, statutory ambiguities in immigration laws must be resolved in favor of the alien. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 449 (1987); *INS v. Errico*, 385 U.S. 214, 225 (1966); *see also Grace*, 344 F. Supp. 3d at 117 (same). Ambiguous language is also construed in keeping with the "reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts" (*Clark v. Martinez*, 543 U.S. 371, 381 (2005))—such as the due process concerns that would arise if the government were able to wholly evade judicial review by transforming the credible fear process through a series of unwritten and unauthorized policies and government actions.   While Congress can limit jurisdiction, it cannot do so in a way that violates other constitutional rights. Here, it is undisputed that, at minimum, "the procedure authorized by Congress" is a form of due process to which Plaintiffs have a right.   *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950).   Plaintiffs sued here because Defendants abridged Plaintiffs' right to fair process and procedure.   Congress could not intend § 1252(e)(3) as a jurisdictional bar that insulates unauthorized, unwritten, or secret government action from review as doing so would necessarily abridge Due Process.   Any doubt as to application of § 1252 to Plaintiffs' claims must accordingly be resolved in favor of Plaintiffs.

---

[2] *See, e.g.*, *Make the Road N.Y.*, 405 F. Supp. 3d at 27 (construing § 1252 as Plaintiffs do here).

### 3.      *Defendants Rely on Cases that Did Not Address the Above Issues*

Defendants base their view that § 1252 bars "unwritten actions of the agency from judicial review" solely on *AILA v. Reno*, 18 F. Supp. 2d 38, 58 (1998).  Defs. Supp. Op. at 25.[3] But in *AILA*, the court never reviewed whether § 1252(e) should be construed alone versus in context of subsection (a)—the parties did not litigate that issue.  In that decision, Judge Sullivan did not consider that question of construction and instead accepted the parties' view of § 1252(e) as wrongly existing in the abstract.  Thus, *AILA* is not precedent with regard to the construction question above that was not addressed in that case (in the unlikely event that the policies are unwritten).  *Cf. Johnson v. District of Columbia*, 850 F. Supp. 2d 74, 79 (D.D.C. 2012) ("A District Court is comprised of individual judges who reach decisions that are not binding on anyone else.").  This question must be independently considered by this Court.

The court in *AILA* also carefully limited its decision with the caveat that the "plaintiffs have never argued that [the § 1252(e)(3) limit] is unconstitutional because it acts as a bar to judicial review."  18 F. Supp. 2d at 47 n.8.  In contrast, since Defendants now argue that § 1252 wholly bars claims for unauthorized or unwritten actions, or actions taken in secret, Plaintiffs *do* assert here that such a bar on judicial review is unconstitutional, an issue *AILA* did not reach.

The Constitution mandates: "The judicial Power of the United States, *shall* be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish. … [and] *shall* extend to *all* Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority."  Art. III, §§ 1, 2 (emphasis added).  Thus, while Congress may limit jurisdiction (e.g., require that certain claims be bought in this District, or based on certain timing), it cannot

---

[3] Defendants also cite the out-of-circuit case *Khan v. Holder*, 608 F.3d 325, 330–31 (7th Cir. 2010), which itself only cites back to *AILA v. Reno* on the disputed proposition.

wholly remove or bar judicial review of cases that Article III, Section 2 expressly cites—some court, supreme or inferior, must be available to hear such cases.[4]  To state otherwise defeats the long-held pillar of separation of powers that "[i]t is emphatically the province and duty of the Judicial Department to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803).

Here, each of Plaintiffs claims—questions of federal law, constitutional violations, and treaty violations—are listed in the Article III, Section II mandate.  Defendants cannot be correct that no court anywhere has *or ever had* jurisdiction to review such claims if they implicate government action taken in secret, or without authorization, or without a writing.  It cannot be correct that Congress intended, or that the Constitution allows, the government to violate its own laws and the constitutional rights of migrants without judicial review so long as the government does so in secret or by acting outside proper and constitutional chains of authorization.

**B.  Plaintiffs Have Satisfied § 1252(e)(3) to the Extent It Applies Here**

Section 1252(e)(3) *does* apply to this case insofar as the Challenged Actions are encompassed in properly authorized writings.  Plaintiffs, however, have satisfied all of the statutory prerequisites to an action under that section.

---

[4] *See, e.g.*, Robert N. Clinton, *A Mandatory View of Federal Court Jurisdiction: A Guided Quest for the Original Understanding of Article III*, 132 U Pa L Rev 741 (1984); Robert N. Clinton, *A Mandatory View of Federal Court Jurisdiction: Early Implementation of and Departures from the Constitutional Plan*, 86 Colum L Rev 1515 (1986); Akhil Reed Amar, *A Neo-Federalist View of Article III: Separating the Two Tiers of Federal Jurisdiction*, 65 BU L Rev 205 (1985); Akhil Reed Amar, *The Two-Tiered Structure of the Judiciary Act of 1789*, 138 U Pa L Rev 1499 (1990).  Trial jurisdiction would thus have to be vested in higher courts to divest lower courts of jurisdiction over constitutional claims.  *Martin v. Hunter's Lessee*, 14 U.S. 304, 331 (1816); *see also id.* at 327–330.  It is "untenable" to assume that "constitutional courts may be deprived in all cases of the determination of facts upon evidence [where] a constitutional right may be involved."  *Crowell v. Benson*, 285 U.S. 22, 60–61 (1932).  "[T]he essential independence of the exercise of the judicial power of the United States, in the enforcement of constitutional rights requires that the federal court should determine such an issue…."  *Id*. at 63.

## 1.       *Plaintiffs Filed Within 60 Days of Implementation*

A suit filed under § 1252(e)(3) must be brought in this Court (8 U.S.C. § 1252(e)(3)(A))

and "must be filed no later than 60 days after the date" the challenged action "is first

implemented" (*id.* § 1252(e)(3)(B)). Plaintiffs complied with those requirements. There can be

no question that Plaintiffs brought suit in the correct court or that they did so within 60 days of

the implementation of any written action on or subsequent to Defendant's Asylum Bar.[5]  2d. Am.

Compl. ¶ 1 & n.1. Plaintiffs also filed within 60 days of the *implementation* of the

"Memorandum of Agreement" between CBP and USCIS.  Caudill-Mirillo Decl. at Ex. 4 [Dkt.

59-1 at pp. 68–72].  Although this "agreement" was *signed* on July 10, 2019 (69 days before

filing), it was not *implemented* until later (substantially later for families and children at Dilley).

On its face, the agreement calls for the *future* performance of 36 numbered tasks by USCIS and

CBP, including the coordination and completion of training, followed by on-site interview tasks

that were not implemented until weeks later.[6]  As further discussed below, Plaintiffs contend that

Defendants are withholding multiple written directives that post-date July 16, 2019, all of which

would categorically fall within 60 days of filing.  Thus, to the extent § 1252(e)(3) applies to such

written directives, Plaintiffs have satisfied it.

## 2.       *Defendants Cannot Rely on Secret, Non-public Writings to Bar Claims*

Defendants also contend that the filing deadline in § 1252(e)(3)(B) commences based on

the government's issuance in secret of *non-public* written directives.  *E.g.*, Defs. Supp. Op. at 17.

---

[5] Defendants misstate that Plaintiffs disclaim "any challenge" to the Asylum Bar.  Defs. Supp. Op. at 2, 12.  Plaintiffs alleged that the Bar itself is illegal, but defer in the first instance to the ruling on that issue in a parallel matter.  2d Am. Compl. ¶ 6 n.4.  Plaintiffs instead challenge (among other actions) Defendants follow-along conduct violating the rights of the Plaintiffs, whether engaged in by Defendants to purportedly implement the Bar or for other reasons.

[6] *See, e.g.*, Supplemental Fluharty Decl. ¶ 52, stating that CBP Agents began conducting Credible Fear Interviews for the first time the week of September 9, 2019.

For example, Defendants contend that any § 1252(e)(3)(B) deadline concerning the above July 10, 2019, "Agreement" as relevant to, inter alia, Challenged Action No. 2 should be counted from that date (setting aside that it was not *implemented* on that date). But that "agreement" was never made public in July so as to initiate any filing window under § 1252(e)(3)(B). Defendants made this agreement in secret, did not publicly disclose it, and only publicly released it after 60 days passed. It defies credulity for Defendants to suggest that § 1252 bars claims under those circumstances. *But see* Defs. Supp. Op. at 17. Defendants view that § 1252 extinguishes claims before public notice exists for them is neither constitutionally nor textually supported (i.e., no clear statement of congressional intent exists) for the reasons detailed above.

Section 1252(e)(3) was enacted, and cases like *AILA* decided, on the premise that the "written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General" that the government would use to enact changes would be the *publication* of a formalized writing, subject to 60-day *public* review. As the *AILA* court held, "Congress did not intend to create a false impression that it intended that there be judicial review." 18 F. Supp. 2d at 49. Plaintiffs cite no authority that ever approved of the government issuing secret writings to start filing clocks for claims for which claimants are not given notice. No court has ever construed § 1252 to permit this, nor is there any legislative record, statutory statement, or other evidence of any intent for that result. To the contrary, as Senator Hatch stated: "It is very important to me that there be judicial review … Although the review should be expedited, the INS and Department of Justice should not be insulated from review." 142 Cong. Rec. S11,491 (daily ed. Sept. 27, 1996).

As is outlined in the Plaintiffs Second Amended Complaint and below, to the extent the government issued directives in secret, Plaintiffs were neither given meaningful notice of the

governments' action nor given an opportunity to immediately challenge it.  Thus, the argument that Plaintiffs' failed to bring their case during this period of secrecy is without merit.

### 3.     The 60-Day Period in § 1252(e)(3)(B) Is Subject to Equitable Tolling

Under subsection (e)(3)(B):

> Deadlines for bringing actions
> Any action instituted under this paragraph must be filed no later than 60 days
> after the date the challenged section, regulation, directive, guideline, or
> procedure described in clause (i) or (ii) of subparagraph (A) is first implemented.

Although Plaintiffs' Complaint was filed within 60 days of the policy implementations resulting in the Challenged Actions, to the extent Defendants assert an earlier implementation (which their present submission has not established), § 1252(e)(3)(B) is subject to equitable tolling.  Although the court in *AILA* treated the deadline as jurisdictional, it did so as noted above based on a different record without examining the full context of § 1252 and related constitutional issues (which the court expressly noted, *AILA*, 18 F. Supp. 2d at 47 n. 8.).

The question before the court in *AILA* was whether Congress intended to limit judicial review of formal written regulations published in the Federal Register.  But Defendants now raise a different question, arguing that § 1252(e)(3)(B)'s reference to "written policy directive[s], written policy guideline[s], or written procedure[s] issued by or under the authority of the Attorney General" should expand to *internal* government email or *non-public* documents. Plaintiffs contend that the § 1252(e)(3)(B) 60-day period does not commence from secret, internal document creation dates; if it did, it would change the jurisdictional inquiry.  The Court would have to redetermine that there was a clear statement and clear and convincing evidence of congressional intent to do so (which there is not).  *AILA* did not undertake that inquiry.

There is a presumption that filing deadlines, including for suit against the United States, are subject to equitable tolling.  *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 95–96 (1990).

The Supreme Court has held that "most time bars are non-jurisdictional"—"filing deadlines" are "'quintessential claim-processing rules'" that are usually "not jurisdictional." *United States v. Kwai Fun Wong*, 135 S. Ct. 1625, 1632 (2015) (quoting *Henderson v. Shinseki*, 562 U.S. 428, 435 (2011)).  Such rules "'seek to promote the orderly progress of litigation,'" but generally "do not deprive a court of authority to hear a case." *Id*. (quoting *Henderson*, 562 U.S. at 435).

To rebut that presumption, *the government* (i.e., Defendants) must "establish, through evidence relating to a particular statute of limitations, that Congress opted to forbid equitable tolling." *Id*. at 1631. "[T]he Government must clear a high bar." *Id*. at 1632.  Here, Defendants must show that "Congress has 'clearly state[d]'" that the 60-day limit has jurisdictional significance. *Id.* (quoting *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 153 (2013)). "[T]raditional tools of statutory construction must *plainly show* that Congress imbued a procedural bar with jurisdictional consequences." *Id.* (emphasis added).

Defendants offer no evidence of Congressional intent or argument of statutory construction to carry their high burden, nor could they.  First, on its text, § 1252(e)(3)(B) "is not couched in jurisdictional terms." *Make the Road N.Y.*, 405 F. Supp. 3d at 26.  Rather, it merely states that actions "must be filed no later than" a set date under a header titled "Deadlines for Bringing Actions."  This is wording used for most non-jurisdictional statutes of limitation and "'does not speak in jurisdictional terms.'" *Auburn Reg'l*, 568 U.S. at 154 (quoting *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 394 (1982)).  The words "must be filed" do not implicate the authority of a court to hear a case, but speaks only to "'a party's procedural obligations.'" *Fort Bend Cnty. v. Davis*, 139 S. Ct. 1843, 1851 (2019) (quoting *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 512 (2014)).  It makes no difference that § 1252(e)(3)(B) uses the word "must." *E.g.*, *Gonzalez v. Thaler*, 565 U.S. 134, 146 (2012).  The Supreme Court has

held that equally "mandatory" language stating "a person adversely affected by [a] decision *shall* file a notice of appeal" within a given period—is not jurisdictional. *Henderson*, 562 U.S. at 438. The Court reached the same conclusion with even more emphatic language stating that a "tort claim against the United States shall be forever barred" if not timely filed. *Kwai Fun Wong*, 135 S. Ct. at 1632–33; *see also Musacchio v. United States*, 136 S. Ct. 709, 716–18 (2016) (that "no person shall be prosecuted, tried, or punished" outside a certain period is not jurisdictional).

Second, it makes no difference if the proceeding or antecedent provision to § 1252(e)(3)(B) is jurisdictional. An otherwise non-jurisdictional requirement "does not become jurisdictional simply because it is placed in a section of a statute that also contains jurisdictional provisions." *Auburn*, 568 U.S. at 155 (citing, *inter alia*, *Gonzalez*, 565 U.S. at 146-47). To the contrary, "Congress's separation of a filing deadline from a jurisdictional grant indicates that the time bar is not jurisdictional." *Kwai Fun Wong*, 135 S. Ct. at 1633.

In short, § 1252(e)(3)(B) does not say jurisdiction is *conditioned* on the "Deadline for Bringing Action"—rather, the deadline is stated in the ordinary terms of a statute of limitations, which is not jurisdictional, and thus subject to tolling. While the court in *AILA* labeled the provision as jurisdictional, it did so without benefit of considering the above Supreme Court authority, most of which post-dates *AILA*, and while accepting the parties' arguments that § 1252(e) itself stripped jurisdiction (which it does not).[7] Regardless, Defendants now seek to expand § 1252(e)(3)(B) to reach facts not before the *AILA* court, such as construing the deadline

---

[7] This Court is not bound by a prior district court ruling, much less when there is a change of law, when intervening Supreme Court authority clarifies that a prior ruling was incorrect, when the facts are different, and when a manifest injustice will result from following the ruling. Here, the Supreme Court's holdings in *Kwai Fun Wong*, *Henderson*, *Auburn*, *Fort Bend*, *EME Homer*, *Gonzalez*, and *Musacchio* all postdate *AILA v Reno*; the facts of the government's efforts to act in secret are very different than in *AILA*; and it cannot be seriously contested that it would be unjust to extinguish claims that claimants are unaware of due to the government's intentional efforts to hide its own changes in policies and procedures.

to extend to secret and non-public writings.  Thus, this Court must independently determine if Defendants have met their high burden of showing that Congress intended this extreme result.

This, of course, Defendants have not done.  Even the congressional record is clear that Congress expected that "INS and Department of Justice should not be insulated from review" as Defendants now propose.  *See* 142 Cong. Rec. S11,491 (daily ed. Sept. 27, 1996) (Sen. Hatch).  The obvious and necessary construction of § 1252(e)(3)(B) is that it sets forth an ordinary limitations period, not a jurisdictional bar, and is thus subject to tolling.  Any other view is unconstitutional.  *See* constitutional discussion Parts II.A.2 and II.A.3

### 4.    *A 60-Day Limit Does Not Apply to Actions Taken or Authorized by Defendant Cuccinelli, or by DHS Acting Secretaries McAleenan or Wolf*

At all events, the 60-day deadline cannot possibly apply to Challenged Actions taken by Defendants not properly appointed to their positions.  As Plaintiffs alleged, Defendant Ken Cuccinelli has improperly purported to serve as Acting Director of USCIS without either Senate confirmation per the Appointments Clause of the Constitution (U.S. Const. art. II, § 2, cl. 2) or compliance with the Federal Vacancies Reform Act (FVRA, 5 U.S.C. § 3345 et seq.).  2d Am. Compl. ¶ 117 & n.6; *see also L.M.-M. v. Cuccinelli*, 1:19-cv- 02676, Dkt. 1 [Compl.] at ¶¶ 103–123 (D.D.C. Sept. 6, 2019).[8]  As such, Mr. Cuccinelli's actions as Acting Director have "no force or effect."  5 U.S.C. § 3348(d)(1).  None of Mr. Cuccinelli's actions thus constitute "procedures

---

[8] That "Acting Director" Cuccinelli is acting without constitutional authority and in violation of FVRA is detailed in the June 19, 2019, letter from Jerrold Nadler, Chairman, House Comm. on the Judiciary, et al. to Acting Secretary of Homeland Security Kevin K. McAleenan, available at https://judiciary.house.gov/sites/democrats.judiciary.house.gov/files/documents/06-18-2019%20Letter%20to%20Acting%20Secretary%20McAleenan.pdf.  *See also* Letter from Democracy Forward et al. to Att'y Gen. William Barr & U.S. Att'y Jessie K. Liu (July 22, 2019), *available at* https://democracyforward.org/wp-content/uploads/2019/07/Cuccinelli-Letter.pdf; Letter from Protect Democracy & Constitutional Accountability Ctr. to Acting Sec'y of Homeland Sec. Kevin McAleenan & Acting Dir. of USCIS Kenneth T. Cuccinelli (July 30, 2019), *available at* https://protectdemocracy.org/resource-library/document/cuccinelli-appointment-letter/ or https://assets.documentcloud.org/documents/6228065/Cuccinelli-Letter-July-31-2019.pdf.

or policies adopted by the Attorney General" sufficient to give rise to any limitation on review under § 1252(a)(2)(A)(iv).

All Mr. Cuccinelli's actions (including the USCIS/CBP Agreement dated July 10, 2019) are therefore subject to ordinary judicial review under, e.g., 28 U.S.C. §§ 1331, 1346, 2201, 2202, and fall outside of any limitations on review expressed in § 1252. Likewise, as also alleged by Plaintiffs, Acting Secretary of Homeland Security Chad Wolf and previous Acting Secretary Kevin McAleenan also were not approved by the Senate or appointed in accordance with FVRA. 2d Am. Compl. ¶ 114 & n.5.[9] This renders all actions of either purported Acting Director of "no force or effect." 5 U.S.C. § 3348(d)(1).[10] Thus, their actions do not constitute "procedures or policies adopted by the Attorney General" either, and therefore do not give rise to any limitation on review under § 1252(a)(2)(A)(iv). Their actions are thus also subject to ordinary judicial review under, e.g., 28 U.S.C. §§ 1331, 1346, 2201, 2202.

\* \* \*

In sum, Defendants' view that § 1252 bars any aspect of judicial review requires multiple hurdles that Defendants cannot clear. First, per § 1252(a)(2)(A)(iv), for any limit on review to apply, the Challenged Actions must constitute "procedures and policies adopted by the Attorney General." Unauthorized actions do not qualify. Actions authorized by unconstitutionally appointed officials (e.g., Messrs. McAleenan, Wolf, or Cuccinelli) do not qualify. To limit judicial review, this Court thus must first find that the relevant officials were duly appointed and that the relevant Challenged Actions were authorized through proper administrative channels.

---

[9] *See also* Letter of from H.R. Committee on Homeland Security and Committee on Oversight and Reform to Comptroller General of the United States (Nov. 15, 2019), *available at* https://oversight.house.gov/sites/democrats.oversight.house.gov/files/191115%20T%20Dodaro%20re%20Letter%20to%20GAO%20on%20Wolf-Cuccinelli%20Appointment.pdf.

[10] The Supreme Court has held that challenges to an official's authority fall outside the limits in § 1252 and are thus subject to judicial review. *See Zadvydas v. Davis*, 533 U.S. 678, 688 (2001).

Second, Defendants would need to show that a Challenged Action was memorialized in writing *that was made public* more than 60 days before suit. Even then, there must be no basis for equitable tolling. Yet, there is no Challenged Action for which Defendants have met or can meet the above to limit Plaintiffs claims. Thus, judicial review is not limited in this case.

### C.    Relief Can Be Granted Equally as to Later Added Plaintiffs

According to Defendants, while the Court might provide relief to the initially filing Plaintiffs, later added Plaintiffs must, in Defendants' view, be barred from relief due to the 60-day window in § 1252(e)(3)(B). Setting aside the multiple reasons stated here for why a 60-day limit does not bar Plaintiffs' claims, even assuming it did in part, Defendants' argument has been essentially already rejected. In *O.A. v. Trump*, Judge Moss held that § 1252(e)(3) did not bar the claims of later-added plaintiffs: "Where multiple plaintiffs assert claims seeking precisely the same declaratory or injunctive relief, moreover, and where the court has subject matter jurisdiction to consider the claims of at least one of those plaintiffs, the court need not address its jurisdiction to consider the claims of the remaining plaintiffs." 404 F. Supp. 3d 109, 138 (D.D.C. 2019).

Similarly, in *Grace v. Whitaker*, the government argued as it has here that the Court "may declare the new credible fear policies unlawful," as to the timely claimants, but that "DHS may [still] continue to enforce the policies in all other credible fear interviews." 344 F. Supp. 3d 96, 117 (D.D.C. 2018). Judge Sullivan rejected the government's view: "To state this proposition is to refute it. It is the province of the Court to declare what the law is." *Id.* (citing *Marbury*, 5 U.S. at 177). As in the present case, in *Grace*, "the government cite[d] no authority to support the proposition that a Court may declare an action unlawful but have no power to prevent that

action from violating the rights of the very people it affects" such as later detainees (some of whom are later added Plaintiffs here).  *See id*.[11]

As the D.C. Circuit directs, "[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not [just] that their application to the individual petitioners is proscribed." *Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409–10 (D.C. Cir. 1998) (internal quote omitted); *see Grace*, 344 F. Supp. 3d at 144 (citing same).  As such, to the extent the initial filing Plaintiffs prevail in their claims, the relief afforded them applies equally to later added Plaintiffs, regardless of any alleged time bar.  In fact, such relief would apply to *all migrants* facing expedited removal, whether parties or not.

### D.    Defendants Have Not Produced All Relevant Policies and Directives

Plaintiffs have produced copious evidence in the form of 31 exhibits (to be submitted under seal) attached to the Supplemental Declaration of Shalyn Fluharty summarizing the uniform changes in the credible fear process that constitute the Challenged Actions. *See* Supplemental Fluharty Declaration. As the evidence submitted by Plaintiffs shows, in the period following the Asylum Bar, Defendants and their agents began to systematically and nearly universally engage in the eleven Challenged Actions as listed in Plaintiffs' Second Amended Complaint (and earlier pleadings).  As Plaintiffs pleaded and have shown, this shift in conduct was not a "tendency" or "trend" or the result of a couple of "bad apple" officers, it was lock-step, near universal action at Dilley.  For example, nearly overnight, all credible fear interviews there

---

[11] Nor does Article III standing bar any of the later added Plaintiffs.  "[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 53 n.2 (2006); *see also In re Navy Chaplaincy*, 697 F.3d 1171, 1178 (D.C. Cir. 2012) (because "only one plaintiff must have standing," the court need not consider whether other plaintiffs have standing to pursue their claims); *Comcast Corp. v. F.C.C.*, 579 F.3d 1, 6 (D.C. Cir. 1993) (declining challenge to Article III standing where the parties raised the "same issues" and "essentially the same arguments").

turned adversarial, nearly all were now conducted by improperly trained agents, nearly all featured summary negative determinations using *identical boilerplate language*, and all prior child-sensitive interview techniques ended—all in near unison, and all in violation of the law as stated in Plaintiffs' pleadings.[12]

Defendants now take the untenable position that, for many Challenged Actions, no written directives exist that prompted this sudden shift in behavior.  According to Defendants' position, Defendants' agents must have taken it upon themselves individually to engage (simultaneously) in many of the Challenged Actions without any written direction.  Defendants' sole support for this defense is the declaration of a deputy at USCIS, who broadly opines that no responsive written evidence exists.  Caudill-Mirillo Decl. ¶¶ 24, 26–30, 33–34.  The declarant, however, expresses no basis for any personal knowledge of events outside her purview in the Asylum Office (for example, many of the Challenged Actions are being perpetrated by Border Patrol agents who work at a different agency, CBP).  Nor does the declarant disclose what efforts were taken to collect evidence or to educate herself on the facts. Rather than [check transcript for what the judge said], Defendants have submitted a declaration from a Deputy in a division of one of the Defendant agencies sued. Even with regard to the Asylum Office, John Lafferty, who is the career USCIS official who ran the Asylum Division for six years until he was reassigned in September of 2019, is the individual best suited to provide information and evidence with regard to Plaintiffs' claims, as well as to identify relevant documents with regard to the Challenged Actions. In sum, Ms. Caudill-Mirillo's "evidence" is non-evidence.[13]

---

[12] *See* Supplemental Fluharty Decl. ¶¶ 41-42, 52 - 53, and 101-105.

[13] As such, Plaintiffs object that much of Ms. Caudill-Mirillo's testimony lacks personal knowledge and/or is hearsay, and cannot properly be considered to rebut the evidence provided by Plaintiffs.  *See* Fed. R. Evid. 602, 802 and discussion and authority in Part III.C below.

Plaintiffs disagree with the contention that Defendants' agents were acting in coincidental unison without coordinating written instructions. [14]  Ms. Caudill-Mirillo's declaration itself demonstrates that Defendants are continuing to withhold documents, expressly referring to relevant materials that Defendants still have not produced, such as:[15]

- All training materials used to teach Border Patrol agents to perform functions previously performed by USCIS asylum officers [Dkt. 51-1 at 8, ¶ 19];
- Any "binding" policies and procedures given Border Patrol agents concerning credible fear interviews [*id*. at 8, ¶ 20];
- Iterations of Form M-444 now or previously used [*id*. at 4–5, ¶¶ 9–10];
- Documents authorizing or deciding to further interview Plaintiffs to gather additional information [*id*. at 6, ¶ 15];
- FDNS review determinations for Plaintiffs [*id*. at 6–7, ¶ 16, at 11, ¶ 32];
- Email attachments listed in Ex. 2 [Dkt. 59-1 at 17].

Regardless, as explained above, Defendants' position that "no" written directives exist for multiple Challenged Actions does not affect Plaintiffs' claims or motion with respect to those Actions.  Contrary to Defendants' view, the fact that such Actions were supposedly taken

_____

Accordingly, Ms. Caudill-Mirillo's statements that "no" evidence exists of certain Challenged Actions (Decl. ¶¶ 24, 26–30, 33–34) should be afforded no weight.

[14] By way of example, in response to Plaintiffs Challenged Action No. 11—that agents no longer employ child-sensitive interview techniques using in-person interviews, Defendants' declarant states that phone interviews were authorized as an option in June 2013. Decl. [Dkt. 51-1] at 11–12, ¶ 34 and Ex. 6 thereto.  Ms. Caudill-Mirillo fails to address that for the next six years after Defendants' Ex. 6, USCIS officers continued to universally conduct in-person, child-sensitive interviews at the South Texas Family Residential Center, only to have that practice suddenly and nearly universally reversed through the use of Border Patrol agents conducting Plaintiffs' interviews in 2019.  Supplemental Fluharty Decl. ¶¶ 51-52; 101-105.  Ms. Caudill-Mirillo's suggestion that "no written" directive to do so exists—i.e., that agents coincidentally in lock step changed practices without prompting—is simply not credible.  It seems more likely that either Ms. Caudill-Mirillo has not diligently inquired about the change in policy or that Defendants are withholding the 2019 instruction for agents to conduct *all* interviews by phone.

[15] Plaintiffs have served FOIA requests for relevant documents on Defendants.  But Defendants have not yet substantively responded.  Other organizations have served similar FOIA requests on Defendants for documents relevant to the Challenged Actions in this case, but Defendants have likewise refused meaningful responses to those requests as well.  *See Am. Immigration Council v. U.S. Customs and Border Protection*, No. 1:19-cv- 02965, Dkt. 1, Compl. (D.D.C. Oct. 2, 2019).

without written authorization does not take them beyond the reach of judicial review as Defendants might hope.  Rather, it simply reinforces the illegality of the actions of Defendants and their agents, further enhancing the likelihood of Plaintiffs' ultimate success on the merits.

Nevertheless, to the extent that the Court deems it a predicate to relief that a written directive for a Challenged Action be provided, Plaintiffs respectfully request that the Court order Defendants to produce all relevant communications and materials that have been withheld.

## III.    THE MERITS OF PLAINTIFFS CLAIMS AND THE CHALLENGED ACTIONS

### A.    Defendants Cannot Ignore the Statutory or Regulatory Requirements

In processing migrants and conducting statutorily-mandated fear screenings, Defendants and their agents are obligated to follow the law and respect constitutional rights.  While the constitutional rights of migrants are limited, "the procedure authorized by Congress" is a form of due process to which Plaintiffs undisputedly have a right.  *Knauff*, 338 U.S. at 544.  Agency actions contrary to that shall be declared unlawful, set aside, and enjoined under the APA.  5 U.S.C. § 706(2)(A), (B), and (C).  This holds equally true if actions are "arbitrary, capricious, [or] an abuse of discretion."  *Id*. § 706(2)(A); *see also* 2d Am. Compl. At ¶¶ 174–188, 194–200.

Defendants are also required to follow their own regulations.  *E.g.*, *United States ex. rel. Accardi v Shaughnessy*, 347 U.S. 260, 266, 268 (1954); *Damus v. Nielsen*, 313 F. Supp 317, 335–37 (D.D.C. 2018).  Agencies must follow their own procedures, even if they are "more rigorous than otherwise would be required."  *Morton v. Ruiz*, 415 U.S. 199, 235 (1974).  These applies "with particular force" in cases like that here where "'the rights of individuals are affected.'"  *Damus*, 313 F. Supp. 3d at 335 (quoting *Morton*, 415 U.S. at 235).  Thus, agencies "'may not violate their own rules and regulations to the prejudice of others.'"  *Id*. at 336 (quoting *Battle v. FAA*, 393 F.3d 1330, 1336 (D.C. Cir. 2005) and citing further authority).  Courts in this District recognize that this rule applies not only to regulations, but to "internal agency guidance."

*Id*.  Once an agency creates procedure or guidance, "it denies itself the right to violate those rules."  *Id*. at 338 (quote and cite omitted); *see also id*. at 337 (party may challenge such failure).

As a result, to the extent any Challenged Actions here depart from statutory, regulatory, or agency requirements or guidelines, they must be set aside and enjoined.  5 U.S.C. § 706(2).

### B.    Plaintiffs Are Likely to Prevail on All Challenged Actions

As detailed further in Plaintiffs Second Amended Complaint, ¶¶ 147–161, and in Part III.D below, each of the Challenged Actions undertaken by Defendants and their agents violate the governing statutes, or procedures, regulations or guidance promulgated under congressional authority (and hence also violate Plaintiffs Fifth Amendment Due Process rights).  As such, per 5 U.S.C. § 706(2), each Challenged Action should be declared invalid, set aside, and enjoined.

In addition, each Challenged Action falls into one of two categories.  First, the government now contends that some Challenged Actions, if undertaken, were done so without authorization of the Attorney General, DHS Secretary, or other required authority.  If so, such actions would be categorically undertaken as an abuse of discretion, and hence invalid per 5 U.S.C. § 706(2)(A).

Second, many (if not the remainder) of the Challenged Actions were implemented at the direction of or under the authority of Defendant Cuccinelli.  *E.g.*, Caudill-Mirillo Decl. at Ex. 4 [Dkt. 59-1 at pp. 68–72] (signed by Cuccinelli); *see also id*. at Ex. 1 [Dkt. 59-1 at 14].  But, as detailed above, Mr. Cuccinelli was not acting under a lawful appointment and all actions taken under his authority or direction are of "no force or effect."  5 U.S.C. § 3348(d)(1).[16]  For example, it was Mr. Cuccinelli who "authorized" use of law-enforcement Border Patrol agents to conduct (for the first time ever) credible fear screening.  *See* Caudill-Mirillo Decl. at Ex. 4 [Dkt.

---

[16]  The same result occurs if the authority of DHS Acting Directors Chad Wolf or Kevin McAleenan is relied upon.  *See* discussion in Part II.B.4.

59-1 at pp. 68–72].  But agency regulations *expressly* convey jurisdiction to USCIS to perform this screening (*not to CBP*).  8 C.F.R. 208.2(a).  Congress required that such screening be conducted by asylum officers with "professional training in country conditions, asylum law, and interview techniques comparable to that provided to full-time adjudicators of [asylum] applications" (e.g., by trained USCIS agents).  8 U.S.C. § 1225(b)(1)(B) and (E).  Thus, not only does Mr. Cuccinelli's directive to use Border Patrol law enforcement officers to conduct asylum screening for which they are not properly trained (or suited) violate the law and agency regulations, it is of "no force or effect" because Mr. Cuccinelli was sitting without legal appointment.  5 U.S.C. § 3348(d)(1); discussion Part II.B.4 above.  Under the APA, 5 U.S.C. § 706(2)(A), all Challenged Actions in this case taken under Mr. Cuccinelli's authority—including his direction to insert Border Patrol agents into the asylum screening process (Challenged Action No. 2, and by extension Nos. 5, 11 and others, *see* 2d Am. Compl. ¶¶ 148, 151–152, 159)—must be declared an agency "abuse of discretion" as well as a violation of law.

Defendants cannot avoid the above result by pointing to their own failure to produce relevant directives.  Here, Defendants' actions are well documented—the facts of their conduct speak for themselves.  Akin to Judge Boasberg's view in *Damus*, 313 F Supp. at 339, "the most compelling evidence in support of Plaintiffs' case" here is "the raw numbers."

Between 98% and 99.8% percent of families represented by DPBP between December 2016 and the summer of 2019 received positive credible fear findings at any given time.  Supplemental Fluharty Decl. § 86. Subsequent to Defendants new Directives, however, DPBP data shows that less than 10% of credible and reasonable fear applicants receive positive fear findings at STFRC. *Id.*

**C.      Defendants Declaration Does Not Provide Any Contrary *Evidence***

Defendants' sole rebuttal to Plaintiffs' showing is a declaration from a D.C.-based deputy in the Asylum division at USCIS—that is, a person who never worked at CBP, does not testify to ever visiting the Dilley facility or having personal knowledge of any interviews there, or otherwise testify to being personally involved in any events resulting in the Challenged Actions. Courts in this District give little or no weight to such conclusory and speculative declarations proffered without personal knowledge.   *See Damus*, 313 F. Supp. 3d at 341 (discounting "Defendants' declarations [that] rely on records that have not been submitted to the Court and are written by individuals who largely did not have direct involvement with the specific" facts).

For example, in *Ramirez v. U.S. Customs and Border Protection*, the court afforded little or no weight to the declaration proffered by defendant CBP.   477 F. Supp. 2d 150, 157–58 (D.D.C. 2007).   Like Ms. Caudill-Mirillo's declaration here, the declarant there had "no personal knowledge of the actual local situation" and offered "no substantive explanation for the Agency's reversal" of operational positions.   *Id*. at 158 (declarant also relied on inadmissible "speculation").   Like the declarant in *Ramirez*, whose "recent professional experience" did not "indicate any familiarity with [the] subject matter" at issue, *id*., here, Ms. Caudill-Mirillo proffers her present role as limited to "oversee[ing] all Asylum Offices nationwide as well as the [USCIS] Asylum Division's headquarters component, which is involved in policy development, quality assurance, and overall management of the asylum program."   Decl. [Dkt. 59-1] ¶ 1.   This lawsuit, however, includes claims based upon activities largely conducted by *CBP* agents at the South Texas Family "Residential" Center in Dilley—a prison-like detention facility operated by *ICE*, not USCIS.   Yet Ms. Caudill-Mirillo has never worked for either CBP or ICE, nor proffers that she ever supervised agents from either agency, nor proffers that she ever set foot in Dilley, much less that she ever witnessed any of the events alleged in this case, not even a single

interview. Further, there is no indication in Ms. Caudill-Mirillo's declaration that she is privy to any policy discussions and documents generated within the top levels of the DHS leadership heirarchy (above the level of the component agencies).

Ms. Caudill-Mirillo's declaration is thus hearsay and speculation in the extreme. And her opinions on whether Defendants complied with the law—i.e., the ultimate *legal* issue for the Court here—offer no weight as well. Although Ms. Caudill-Mirillo attempts to gloss over her lack of personal knowledge by stating that her declaration is based in part on "information made known to me from official records and reasonably relied upon in the course of my employment" (Dkt. 59-1 at 1), she proffers no foundation for this. For example, Ms. Caudill-Mirillo never discloses what "official records" she consulted (other than the few attachments to her declaration), nor who provided her information she purports to rely upon. Nor does she lay any business records foundation—she does not testify that she is the custodian for any records she consulted, how or by whom they were created, what their purpose is, etc. And her repeated pronouncement that "no" records or communications exist concerning multiple Challenged Actions (*see* Decl. ¶¶ 24, 26–30, 33–34) is speculation at best— Ms. Caudill-Mirillo testifies to no efforts to search for or review records, nor any efforts to interview agents or custodians, *at all*.

In sum, Ms. Caudill-Mirillo's declaration does not constitute *evidence*. It does not rebut any declarations submitted by Plaintiffs. Defendants offer no evidence or argument that any statements in Plaintiffs' declarations are inaccurate. Dispositive here, Ms. Caudill-Mirillo's declaration does not rebut any of Plaintiffs' declarations attesting to agents' behavior in interviews, and cannot be used as evidence that those events did not occur as she was not there.

### D.    Plaintiffs Will Be Irreparably Harmed If Relief Is Not Granted

In opposing Plaintiffs' request that the Court restrain their deportation, Defendants argue that deportation would not harm Plaintiffs because "Plaintiffs may litigate their programmatic

claims from abroad." Defs. Supp. Op. at 7.  This ignores the truth of why Plaintiffs are here—
Plaintiffs seek asylum and related humanitarian protections in the United States because they
fear that they will be persecuted, tortured, or even killed if they return to their home countries.  It
is meaningless to say that they can litigate their claims from abroad.  Plaintiffs cannot effectively
litigate their claims if they are harmed or killed.

Here, Plaintiffs have provided evidence that they fear persecution or death if they are
deported, which is categorically an irreparable harm.  Defendants, however, have provided no
evidence to the contrary.  Although Defendants issued negative fear determinations to Plaintiffs,
Defendants did so largely based on an Asylum Bar that is deaf to the facts or dangers faced by
Plaintiffs, along with "findings" by improperly trained Border Patrol agents (versus career
asylum officers).  As noted above, in opposing Plaintiffs' motion, Defendants have not submitted
any evidence to rebut Plaintiffs' allegations and showing that Plaintiffs will face persecution,
harm, torture, and/or death if deported.  Plaintiffs showing of irreparable harm is thus unrebutted.

### E.   Plaintiffs Are Entitled to Relief Against Each of the Challenged Actions[17]

#### 1.   *Defendants Failure to Meaningfully Orient Migrants*

8 U.S.C. § 1225 (b)(1)(B)(iv) requires migrants be given information concerning the
interview process prior to their interviews.  The interview must also "determine that the alien has
an understanding of the credible fear determination process."   8 C.F.R. 208.30(d)(2).
Defendants' policy has long been to provide migrants with an in-person orientation to the
process before their interviews occur (in addition to providing applicants a copy of Form M-
444).   Defendants have now just *ceased to conduct such orientations*.   Supplemental
Fluharty Decl. ¶¶ 17, 21-23. Defendants instead now rely solely on distributing a paper form.

---

[17] The subsection categories here of 1 to 11 track Challenged Actions 1 to 11 listed in Plaintiffs
Second Amended Complaint, ¶¶ 147–160, and as summarized in the chart at ¶ 161.

Caudill-Mirillo Decl. ¶¶ 9–10.   And Defendants still have not produced copies of the multiple iterations of such forms.

For example, the M-444 forms provided to Plaintiffs are silent on Defendants' Asylum Bar and the exceptions thereto as well as silent on the "reasonable fear" standard that is summarily applied mid-interview.   *See* Supplemental Fluharty Decl. ¶ 21; Ex. E (M-444 form silent on these issues).   Defendants now nearly universally switch from applying a "credible fear" standard to applying a "reasonable fear" standard in the middle of the interview, with no meaningful further orientation as to the second standard or the distinction between the two (and certainly none provided in advance).   Supplemental Fluharty Decl. ¶¶ 21-22.

### 2.   *Defendants Proceed Without Required Staffing, Training, or Guidance*

8 U.S.C. § 1225(b)(1)(E) requires that fear determinations be made by immigration officers with "professional training in country conditions, asylum law, and interview techniques comparable to that provided to full-time adjudicators of [asylum] applications" who are then supervised by officers with the same experience and "substantial experience adjudicating asylum applications."   *See also* 8 C.F.R. § 208.1(b) (additional training requirements); 2d. Am. Compl. ¶ 148.  8 C.F.R. 208.2(a) expressly vests jurisdiction over both credible fear and reasonable fear determinations with the USCIS division of Refugee, Asylum, and International Operations (RAIO).[18]   Notwithstanding these requirements, to conduct credible and reasonable fear

---

[18] Defendants own declarant confirms that these are roles assigned to USCIS and not to, for example, CBP or Border Patrol agents.  *See* Defs. Supp. Op. at 3 n.1; Caudill-Mirillo Decl. ¶ 2. In her earlier writings, Ms. Caudill-Mirillo has detailed the creation and role of the "a corps of professional Asylum Officers, specially trained in international law and adept in country conditions, was created to adjudicate affirmative asylum claims."  *See* Ashley Caudill-Mirillo, *Laws of Hospitality: Asylum and Refugee Law Panel*, at 3 (May 2011), *available at* https://villagillet.files.wordpress.com/2011/05/caudill-mirillo_ashley_en.pdf.

determinations, Defendants have secretly and without public notice replaced trained, experienced USCIS asylum officers with improperly trained "law enforcement" Border Patrol agents.

Defendants ignore the regulation assigning fear determinations to USCIS and not CBP (8 C.F.R. 208.2(a)) and respond instead on procedural grounds, arguing that 69 days (versus 60) passed between Plaintiffs filing suit and Mr. Cuccinelli secretly authorizing Border Patrol to conduct interviews.  Defs. Supp. Op. at 17.  The lack of merit for this is addressed above.

Defendants also contend that Border Patrol agents are trained for several weeks.  *Id*.; Caudill-Mirillo Decl. ¶ 24.  To start, a few weeks of training (even if performed) is not "comparable to that provided to full-time" career adjudicators of asylum, Defendants have failed to provide the training materials or schedules.  No doubt, if it were robust, Defendants would have produced it as requested.  Defendants' declarant, Ms. Caudill-Mirillo, has separately confirmed that real asylum agents undergo "two six-week residential training programs" plus additional further training.  *See* Ashley Caudill-Mirillo, *Laws of Hospitality: Asylum and Refugee Law Panel*, at 3 (May 2011), *available at* https://villagillet.files.wordpress.com/2011/05/caudill-mirillo_ashley_en.pdf. This is far more than Defendants now contend Border Patrol received, evidencing a direct violation of 8 U.S.C. § 1225(b)(1)(E).

Moreover, facts on the ground confirm this lack of training for Border Patrol— improperly trained Border Patrol agents are showing little knowledge of asylum laws, procedures, country conditions, or facts relevant to fear determinations.  With respect to Defendants' Asylum Bar, Defendants have also failed to properly train officers (either at Border Patrol or USCIS) on the impact, and most critically on exceptions to, Defendants' Asylum Bar, as evidenced by the lack of competency in the interviewing and determinations made on this issue alone.

For example, Plaintiffs who have been survivors of severe forms of human trafficking, Plaintiffs who are from Mexico and who have never passed through a third country, and Plaintiffs arrived to the airport without entering the United States along the southern border, have all been subjected to the Asylum Bar in error. Supplemental Fluharty Decl. ¶¶ 31, 35, 40.

In sum, Defendant Cuccinelli's directive to use Border Patrol to conduct asylum screening is unconstitutional as he was not validly appointed to authorize it; it also violates agency regulations assigning that role to USCIS; and it violates Congress's requirement that only officers well trained in the relevant law and facts be assigned to this critical and sensitive role. Many of the Plaintiffs were screened in an adversarial manner by improperly trained Border Patrol agents, rendering those interviews legally and constitutionally improper, thus violating Plaintiffs' rights.

### 3. Defendants Issue Summary Negative Determinations to Eliminate Supervisory Review and to Avoid Developing a Complete Written Record

In the process of making a fear determination, the interviewing asylum officer must "elicit all relevant and useful information bearing on whether the applicant has a credible fear" as required by law, and only after review and concurrence by a supervisory asylum officer, issue a credible fear finding.  8 C.F.R. § 208.30(d).  As Defendants' declarant wrote: "Asylum Officers have an affirmative duty to elicit testimony and pursue all potential avenues of eligibility, thereby giving the applicant an opportunity to tell every aspect of their situation and relieving the applicant of responsibility of understanding the intricacies of asylum law."  Ashley Caudill-Mirillo, *Laws of Hospitality: Asylum and Refugee Law Panel*, at 4 (May 2011), *available at* https://villagillet.files.wordpress.com/2011/05/caudill-mirillo_ashley_en.pdf.        Meaningful supervisory review of fear determinations is also required before a determination is made. 8 C.F.R. §§ 208.30(e)(7), 235.3(b)(2), (b)(7).

Yet, in implementing Defendants' Asylum Bar, after determining that a migrant did not apply for Asylum in Mexico or meet an exception to the Bar, Defendants summarily announce a negative fear determination in the middle of the interview without supervisory review.[19]   (This has even been done with Mexican asylum seekers, and asylum seekers who did not enter the United States through the southern border, to whom Defendants' Bar does not and should not apply as a matter of law).   This truncated questioning gives short (if any) shrift to the *required* parallel assessment of eligibility for non-refoulement.

As a result, Plaintiffs were intimidated and discouraged from asserting their rights and providing testimony, and denied the right to have the record of their fear of persecution or torture fully, adequately, and accurately memorialized.   Such records are also used as future evidence by USCIS on review by an ILJ or if later asylum or non-refoulement claims are made. Plaintiffs and their later claims are thus irreparably harmed if that record is not complete and accurate.   2d. Am. Compl. ¶ 149.

In response to the above, Defendants do not deny the fact that migrants are told up front that they do not meet the required standard; Defendants merely shrug that this is a consequence of their Asylum Bar (the "Third-Country Transit Bar").   Defs. Supp. Op. at 11.   But this is not true.   The Bar requires officers to "make a negative credible-fear finding" (Defs. Supp. Op. at 4 (quoting 84 Fed. Reg. at 33,837-38))—*it does not require officers to intimidatingly announce that finding in the middle of the interview.*   Setting aside that the Bar itself is illegal (per the parallel legal challenge), nothing in the Bar prohibits Defendants from following the required procedure.   In implementing the Bar, Defendants could follow the law and develop a complete factual record of the migrant's basis for fear, and have that reviewed by a supervisor.   Although

---

[19]   Supplemental Fluharty Decl. ¶¶ 21-22.

the ultimate determination may still be "negative"—the record of the fear interview would be complete and accurate if used as evidence for a later asylum claim, or if the Bar were ever overturned.  Instead, Defendants are systematically allowing inaccurate and incomplete factual findings to be created for asylum records that falsely purport to represent Plaintiffs' comprehensive bases for their claims of fear.

Defendants contend that "Plaintiffs expressly disclaim any challenge to the transit rule, and so cannot challenge the guidance issued to implement that rule."  Defs. Supp. Op. at 12. This is also wrong.  While Plaintiffs do not intend to duplicate litigation over the Asylum Bar itself, nowhere did Plaintiffs say they were not challenging the guidance and procedures used to implement the Bar (such as here, where further rights are impaired than what the Bar states must be impaired).  To the contrary, Paragraph 1 of Plaintiffs' present and prior complaints all state that Plaintiffs are challenging Defendants' follow-along actions.

Lastly, Defendants argue that the "implementation guidance" for the Asylum Bar (*see* Caudill-Mirillo Decl. ¶¶ 6, 12 and Ex. 3 thereto) that purports to result in this Challenge Action was not "issued under the authority" of the DHS Secretary and "does not complete, perform, or carry into effect of any 'authority' of the Secretary under § 1225(b)(1)."  Defs. Supp. Op. 12–14. While argued to try to suggest that there is no "jurisdiction" to review these directives under Defendants' inaccurate view of § 1252, Defendants concede that what their own declarant testifies is "[w]ritten implementation guidance" (Decl. ¶ 6) was proffered without authorization and thus is categorically subject to be set aside under the APA as an act taken without authority.

### 4.    *Defendants Limit Fact-finding Relevant to a Significant Possibility of Eligibility for Asylum, Withholding of Removal, and Relief Under the Convention Against Torture*

8 C.F.R. § 208(d) requires interviewers to "elicit *all* relevant and useful information bearing on whether the applicant has a credible fear of persecution or torture" (emphasis added).

Yet, in kind with Challenged Action No. 3 above and departing from prior procedure, once an interviewer finds that the Asylum Bar may apply, the interviewer now limits questioning, thus failing to elicit all testimony and facts relevant to or supportive of a migrant's potential claim prior to announcing to the applicant that they have not established a credible fear.[20] Inexperienced and poorly trained Border Patrol agents likewise fail to elicit relevant testimony to create a complete record, assuming that if one is not eligible for asylum, certain lines of inquiry are no longer useful or relevant to their credible fear determination. These deficiencies impair Plaintiffs' rights to seek IJ review, or to later petition for asylum, by distorting the record of their fear determinations, which will be later used by the IJ and to evaluate any later asylum petition. The resulting record is necessarily incomplete and inaccurate. The evidentiary record of the interview to which Plaintiffs are entitled by law is thus irreparably compromised *ab initio*, prejudicing later claims for asylum or *non-refoulement* by Plaintiffs. 2d. Am. Compl. ¶ 150 & n.12.

As with Challenged Action No. 3, although the transit Asylum Bar is illegal, nothing in that decree prevents Defendants from developing a full and complete interview record through proper questioning as required by law and then still applying the Bar.

### 5.    *Defendants Make Interviews Adversarial*

8 U.S.C. § 208.30(d) also requires that the fear determination interview be conducted "in a nonadversarial manner."[21] Tellingly, Defendants do not dispute that, in fact, interviews are now improperly adversarial in violation of 8 U.S.C. § 208.30(d). Defendants' argument is

---

[20]  Supplemental Fluharty Decl. ¶ 46.

[21]  For an excellent summary of why interviews must be non-adversarial, see the prior statement by Defendants' declarant, Ashley Caudill-Mirillo, *Laws of Hospitality: Asylum and Refugee Law Panel*, at 4 (May 2011), *available at* https://villagillet.files.wordpress.com/2011/05/caudill-mirillo_ashley_en.pdf.

instead only procedural—that no judicial review is available to remedy Defendants' unlawful conduct.  *See* Defs. Supp. Op. at 26.  But the lack of merit for Defendants' defense is addressed above.

In violation of 8 U.S.C. § 208.30(d), Defendants have now instituted law enforcement-type interrogations instead of neutral interviews by the Asylum Office (including using Border Patrol agents to conduct interviews).  2d Amend. Compl. ¶¶ 151–53.  Migrants are now often interviewed not once, but three or more times on multiple days over many weeks, often by multiple officers repeating the same questions, all in an effort to give rise to a false impression of inconsistency or the surrender of rights.  Defendants' adversarial interrogation tactics render it impossible for Plaintiffs and other trauma survivors to fully disclose their experiences to the interrogating officer.  Indeed, at Dilley, women survivors of horrific instances of gender-based violence are subject to interviews by at least one CBP agent whose public Facebook page features a picture of a CD entitled "Songs I'll choke you out to while wrecking your uterus." Supplemental Fluharty Decl. ¶¶ 56-57.

As detailed above, Defendants use of law enforcement Border Patrol to now conduct interviews instead of USCIS agents trained in non-adversarial interviewing techniques cannot be squared with the law.  Border Patrol—the agency that detained and has held Plaintiffs in custody—are not neutral, unbiased arbiters of asylum law able to conduct "non-adversarial" interviews of their detainees.[22]  "Law enforcement officers function as adversaries" to those they

---

[22] *See, e.g.*, John Washington, *Bad Information: Border Patrol Arrest Reports Are Full of Lies That Can Sabotage Asylum Claims*, the Intercept (Aug. 11, 2019), *available at* https://theintercept.com/2019/08/11/border-patrol-asylum-claim/; Human Rights First, *Crossing the Line: U.S. Border Agents Illegally Reject Asylum Seekers*, 5–8 (2017), *available at* https://www.humanrightsfirst.org/sites/default/files/hrf-crossing-the-line-report.pdf; A.C. Thompson, *Inside the Secret Border Patrol Facebook Group Where Agents Joke About Migrant Deaths and Post Sexist Memes*, ProPublica (July 1, 2019*), available at*

detain.  *See New Jersey v. T.L.O.*, 469 U.S. 325, 349 (1985) (Powell, J., concurring).  USCIS's guidelines confirm that "a non-adversarial proceeding [is] one in which the parties are not in opposition to each other. ... In this determination, the officer is a neutral decision-maker, not an advocate for either side."  USCIS Policy Manual, *Appendix 15-2 Non-Adversarial Interview Techniques*,  https://www.uscis.gov/ilink/docView/AFM/HTML/AFM/0-0-0-1/0-0-0-26573/0-0-0-28729.html.  Yet, the Administration replaced trained USCIS Asylum Officers with Border Patrol officers specifically because the trained Asylum Officers were viewed as "soft" (i.e., neutral), and Border Patrol law enforcement "would be tougher critics of asylum seekers" (i.e., not neutral).  *See* Jay Willis, *Stephen Miller Is Trying to Break the Asylum Process*, GQ (July 30, 2019), *available at* https://www.gq.com/story/asylum-border-patrol-interviews.

And again, the facts speak loudly here—Border Patrol agents and others who interrogated rather than interviewed Plaintiffs at Dilley proved themselves incapable of fulfilling USCIS guidelines for non-adversarial interviews.  The recent conduct of agents interrogating migrants during fear screening in Dilley has been beyond the pale and in abject contravention to the law and USCIS's guidelines.  Supplemental Fluharty Decl. ¶¶ 60-64.

For example, while providing testimony during her interview, child Plaintiff E.B.V. began to cry. Supplemental Fluharty Decl. ¶ 64. Her mother L.V.M. attempted to comfort her. The CBP Agent conducting the child's interview then scolded the mother, stating: "Don't involve yourself." During Plaintiff C.C.N.'s interview, the CBP Agent conducting the interview laughed at C.C.N., stating through laughter, "I don't believe you;". W.P.R. reports that during her credible fear interview, the male CBP Agent who interviewed her screamed, "Don't be telling lies! I don't want to hear this movie." And during child Plaintiff E.P.G.'s interview, when

---

https://www.propublica.org/article/secret-border-patrol-facebook-group-agents-joke-about-migrant-deaths-post-sexist-memes.

she began to cry, the CBP Agent conducting her interview mocked her, stating: "what's so sad about this story, that you are crying." *Id.*

As a result, many Plaintiffs believed at the outset of their interview that their deportation was certain. They report feeling paralyzed, overwhelmed, intimidated and confused the moment they were informed mid-interview that their credible fear claim was denied.  For example, Plaintiff R.C.H. reported to DPBP that she got scared and nervous when told she would not be eligible for asylum, and therefore did not present her full case. Supplemental Fluharty Decl. § 43. Similarly, Plaintiff M.C.M. reported that she became frightened upon the asylum officer's advisals that she was not eligible for asylum, and that her teenage daughter S.C.M., who was listening, started crying at that moment. Supplemental Fluharty Decl. § 44.

### 6.    Defendants Limit Migrants' Rights to Consultation

8 U.S.C. § 1225 (b)(1)(B)(iv) also requires that, prior to being interviewed, migrants must be given the right to consult with an advocate, consultant or attorney of their choosing.  *See also* U.S. Const., Amend.  I; 5 U.S.C. § 555(b); 8 C.F.R. § 208.30(d)(4); 2d. Am. Compl. ¶ 154. Defendants attribute this to the fact that they have now shortened the time period before interviews to just one day. However, again, there is nothing that inherently prevents the Defendants from facilitating a reasonable right to contact and consult with an advocate or advisor. To the extent that Defendants are incapable of doing so due to the shortened time period, then their policy is unlawful. Access to counsel is further abridged by Defendants scheduling multiple, repeat interviews, often without sufficient (or any) advance written notice.  As noted with Challenged Action No. 7, Defendants also now nearly universally switch from applying a "credible fear" standard to applying a "reasonable fear" standard in the middle of an interview, with no meaningful opportunity (in fact, no opportunity at all) then given to consult an advocate on the distinction.

### 7.    *Defendants Apply RFI Standards Without RFI Protections*

If a migrant is otherwise subject to removal, such as after an asylum officer makes a negative credible fear determination, the migrant is still screened for a "a reasonable fear of persecution or torture" under procedures set forth in 8 C.F.R. § 208.31.  Both the statute and the regulation expressly give the migrant a right to consult with counsel, have them present at the interview, have a complete factual record developed and recorded, all in a non-adversarial way. *See* 8 U.S.C. § 1228; 8 C.F.R. § 208.31(c).

Yet, as described above, rather than follow the required "reasonable fear interview" procedure and provide Plaintiffs with the above required protections, Defendants have opted to now essentially stop "credible fear" interviews midstream and switch to interrogating Plaintiffs and other migrants on "reasonable fear."  This is done without advising them or orienting them to the new standard, and without the required procedural protections—notice, an opportunity to consult with counsel, the opportunity to have counsel present, etc.  *See* 8 C.F.R. § 208.31(c). At no time were Plaintiffs provided with an M-488 form detailing their rights in reasonable fear interviews.

Once again Defendants assert that their hands are tied and that the procedure they are following is dictated by their Asylum Bar (i.e., the Third-Country Transit Bar).  Defs. Supp. Op. at 10.  Nothing in that Bar blocks or prohibits the government from properly applying the "reasonable fear interview" protections afforded by law.  The Bar simply says that migrants shall be screened for reasonable fear—it does not say that migrants shall be screened for reasonable fear "without the protections afforded to such screening by law."

### 8.     *Defendants Do Not Apply the Most Favorable Precedent in CFI Proceedings (i.e., violating Grace v. Whitaker)*

Under *Grace v. Whitaker*, 344 F. Supp. 3d 96 (D.D.C. 2018), officers must apply the most favorable circuit precedent in credible fear interviews, regardless of where an asylum-seeker is detained.  *See* 2d Am. Compl. ¶ 156.  Yet, at Dilley, interviewers are instructed to apply only Fifth Circuit authority, ignoring authority more favorable to migrants from other circuits.[23]

Defendants' defense relies solely on their declarant's conclusory, unsupported, legal conclusion that "USCIS remains in compliance" with *Grace*.  Defs. Supp. Op. at 26–27; Caudill-Mirillo Decl. ¶ 31.  This is tautological non-evidence.  Defendants also argue that this Court cannot do anything about Defendants' violations because they are violating the order of a different court.  Defs. Supp. Op. at 27.  This is argument is equally untenable.  The *Grace* settlement and injunction set forth the law that Defendants have to follow in processing *all* migrants, including Plaintiffs.  It becomes part of the procedure to which Plaintiffs have a right.  Failure to afford Plaintiffs that procedure is in turn actionable under, *inter alia*, the APA.  According to Defendants' view, by example, any child denied a non-segregated education in violation of *Brown v. Board of Education* would need to sue in the Supreme Court because that was the court that issued the original order.  This is not a colorable legal position.

### 9.     *Defendants Imposed Mandatory Review by the Fraud Detection Unit*

Per 8 U.S.C. § 1225(b)(1)(E), credible fear determinations must made by immigration officers with "professional training in country conditions, asylum law, and interview techniques comparable to that provided to full-time adjudicators of [asylum] applications" supervised by officers with the *same* experience and "substantial experience adjudicating asylum applications."  There is no allowance for supervisory review or decisional direction or directives by supposed

---

[23]  Supplemental Fluharty Decl. §§ 79-84.

"fraud" officers, who lack the statutorily required training and are not witnesses to the interview. *See* 2d Am. Compl. ¶ 157.   As Plaintiffs also pleaded, this Challenged Action is "directed at arbitrarily limiting the number of families placed in credible fear proceedings that can obtain positive determination" (i.e., arbitrary and capricious).  *E.g.*, *id.* [24]

Yet, Defendants' own declarant confirms that all positive credible fear determinations at Dilley from August 30, 2019 to November 7, 2019 were sent for "fraud" unit review.   Caudill-Mirillo Decl. ¶ 32.   Defendants provide no evidence to rebut the fact that members of this unit lack the statutorily required experience to adjudicate or supervise credible fear determinations. *See id.*[25]

Defendants' assertion that Plaintiffs have no evidence that the "fraud" supervisors had any impact (Defs. Supp. Op. at 21) ignores the numbers—there was an overwhelming drop in positive determinations which indicates that a substantial number of determinations were impacted by the Challenged Actions. Supplemental Fluharty Decl. § 86; *see also Damus*, 313 F Supp. at 339 ("[T]he most compelling evidence in support of Plaintiffs' case" is "the raw numbers.").   Moreover, the Defendants have not disclosed which of the Plaintiffs' initial positive credible fear determinations were reversed by the Fraud Detection Unit. Defendants cannot withhold which of the Plaintiffs were subject to this review and then argue that the Court lacks jurisdiction based on the information withheld. Defendants' assertion that their actions are entitled to deference, or are backed by "good reasons" (Defs. Supp. Op. at 22–24) is equally unavailing—courts do not afford deference where the agency's action *conflicts* with the law. Defendants are welcome to have supervisory review for fraud, provided that those supervisors

---

[24]   Defendants assertion that Plaintiffs have not identified a basis for this Challenged Action (Defs. Supp. Op. at 21–22) is thus not accurate.

[25]   Defendants arguments that later-added Plaintiffs' claims cannot be brought on this Challenged Action (Defs. Supp. Op. at 20) are addressed above in Part II.C.

are trained in the underlying asylum law, country conditions, and adjudication of such matters as required by law.  Defendants cannot have supervisors who are not so trained perform such reviews (nor is it practical to see how one could effectively detect fraud without the training required by law.)

### 10.   *Defendants Withhold Facts Relied Upon in Issuing the Credible Fear Determination*

Per 8 U.S.C. § 1225(b)(1)(B)(iii)(II), the interviewing officer must prepare a record that includes all material facts stated by the applicant and any other facts "relied upon by the officer" along with "the officer's analysis of why, in the light of such facts the alien has not established a credible fear of persecution."  *See also* 8 CFR § 208.30(e)(1).  Yet, for many Plaintiffs, a proper record of the interview does not appear to have been prepared (and was not provided to the Plaintiff).  Copies of determinations provided to Plaintiffs often lacked underlying questions and answers in the interview, details on why multiple interviews were scheduled, facts or opinions conveyed by untrained "fraud" supervisors, facts conveyed by or conversations with non-interviewing Border Patrol agents to the interviewing agent that affected the decision, etc.[26] Again, Defendants do not dispute that they have not followed the law—they only defend on the basis that these actions were perpetrated without written authorization.  Defs. Supp. Op. at 27.

### 11.   *Defendants Abandoned Child-Sensitive Treatment Interviews*

As noted above, 8 U.S.C. § 208.30(d) requires that interviews be conducted in a non-adversarial manner.  Given the special circumstances that apply to children, longstanding guidelines exist for conducting non-adversarial interviews with children.  *See* USCIS, Refugee, Asylum and International Operations Directorate (RAIO), *Children's Claims Training Course*, at 26–37    (May    11,    2017    update)    (interviewing    guidance),    *available    at*

---

[26]  Supplemental Fluharty Decl. §§ 96-100.

https://www.aila.org/File/DownloadEmbeddedFile/72289, *see also* https://www.hsdl.org/?abstract&did=19629 (Dec. 10, 1998 Guidelines For Children's Asylum Claims Memorandum).  Until the events giving rise to the present lawsuit—interviews with children were conducted in person by experienced USCIS asylum officers trained in the above guidelines.  This allowed trained asylum officers to apply child-friendly procedures during interviews, and provided protections to mothers, who had to proceed with their credible fear interview while also caring for their child.  Interviews of children are now conducted by phone in an adversarial manner, typically using interrogation-style law enforcement techniques, including on children as young as toddlers.  *See* 2d Am. Compl. ¶ 159.[27]

Again, Defendants do not dispute that that this conduct is occurring—that child interviews are now conducted interrogation style by phone.  Rather, they contend these actions were perpetrated without recent written authorization.  Defs. Supp. Op. at 27; Caudill-Mirillo Decl. ¶ 34.  According to Defendants' declarant, officers were informed over six years ago that they could conduct such interviews by phone.  Decl. ¶ 34 and Ex. 6 thereto [Dkt. 59-1 at 79–80].

Defendants ignore that, notwithstanding the 2013 directive, child interviews have always been performed in person according to the above guidelines—it was only in recent months that Defendants agents' universally and in lock step stopped following USCIS policy.  *See* Footnote 14 above.  In fact, Defendants' own evidence establishes the illegality here—as footnote 1 on page 2 of Defendant's June 4, 2013, memorandum states (*see* Dkt. 59-1 at 80, bottom), in-person interviews *are required* when "there is any indication that the alien does not understand the process."  It defies credibility that Defendants now deem children as young as toddlers to

---

[27] *See also* Supplemental Fluharty Decl. §§ 101-105.

"understand the process" and hence no longer conduct in-person interviews or use child sensitive interviewing techniques as required by Defendant's own memorandum and guidelines.

## IV.    **<u>CONCLUSION</u>**

For the foregoing reasons, Plaintiffs have standing and jurisdiction to assert all their claims, and a likelihood of ultimate success on them.  But Plaintiffs will be irreparably injured—literally persecuted and potentially in some cases killed—if they are deported while their claims proceed.  Nor have Defendants offered any evidence, argument, or authority that contradicts Plaintiffs' showing.  Accordingly, the Court should grant Plaintiffs' motion for a TRO as requested and afford whatever further relief the Court deems necessary at this stage.

Respectfully submitted this 13th day of January, 2020,

Dated:      January 13, 2020        By:   /s/Amy Maldonado
                                         *Amy Maldonado (IL Bar No. 6256961)
                                         Law Office of Amy Maldonado
                                         333 Albert Avenue, Suite 610
                                         East Lansing, MI 48823
                                         Phone: (517) 803-2870
                                         Fax: (888) 299-3780
                                         E-mail: amy@amaldonadolaw.com

Dated:      January 13, 2020        By:   /s/ Gregory P. Copeland
                                         Gregory P. Copeland (Bar No. NY0311)
                                         RAPID DEFENSE NETWORK
                                         11Broadway, Suite 615
                                         New York, NY 10004
                                         Phone: (212) 843-0910
                                         Fax: (212) 257-7033
                                         E-mail: gregory@defensenetwork.org

Dated:      January 13, 2020        By:   /s/ Sarah T. Gillman
                                         Sarah T. Gillman (Bar No. NY0316)
                                         RAPID DEFENSE NETWORK
                                         11Broadway, Suite 615
                                         New York, NY 10004
                                         Phone: (212) 843-0910
                                         Fax: (212) 257-7033
                                         E-mail: sarah@defensenetwork.org

Dated:      January 13, 2020        By:   /s/Bridget Cambria
                                         *Bridget Cambria (PA Bar No. 205271)
                                         Cambria & Kline, P.C.
                                         532 Walnut Street
                                         Reading, PA 19601
                                         Phone: (484) 926-2014
                                         Fax: (484) 926-2032
                                         E-mail: bridget.cambria@cambriaklinelaw.com

Dated:      January 13, 2020        By:   /s/ Elora Mukherjee
                                         * Elora Mukherjee (NY Bar No. 4427233)
                                         Columbia Law School
                                         Morningside Heights Legal Services, Inc.
                                         435 W. 116th Street
                                         New York, NY 10027
                                         Phone:  (212) 854-2603
                                         Fax:  (212) 854-3554

E-mail:  emukherjee@law.columbia.edu

ATTORNEYS FOR THE PLAINTIFF
*Admitted pro hac vice