## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

```
_____
                                    )
M.M.V., et al.,                     )
                                    )
              Plaintiffs,           )
                                    )
      v.                            )        Civil Action No. 19-2773 (ABJ)
                                    )
WILLIAM BARR,                       )
in his official capacity as         )
Attorney General of the             )
United States, et al.,              )
                                    )
              Defendants.           )
_____)
```

## MEMORANDUM OPINION

Plaintiffs, proceeding under pseudonyms, are seeking asylum in the United States.  That process is now governed by a new regulation, referred to as the Transit Ban, which requires asylum seekers to apply first in another country on the way here.  *See* Asylum Eligibility and Procedural Modifications, 84 Fed. Reg. 33,829 (July 16, 2019).  The ban restricts asylum eligibility to those who have applied for protection in another country while in transit to the United States and were denied protection in that country.

This lawsuit does not challenge the Transit Ban directly; plaintiffs challenge what they allege are written regulations, directives, or procedures that have been issued by the administration to implement and enforce the new asylum restrictions.  Second Am. Compl. [Dkt. # 54] ¶¶ 1, 3.

Plaintiffs are mothers and their children who are detained at the South Texas Family Residential Center who have been issued negative credible fear and reasonable fear determinations and have received orders to be removed from the United States.  *Id*. ¶ 12. Defendants are William P. Barr, the Attorney General of the United States; James McHenry, the Director of the Executive

Office for Immigration Review; Chad F. Wolf, the Acting Secretary of the Department of Homeland Security; Matthew T. Albence, the Acting Director of Immigrations and Customs Enforcement; Mark Morgan, the Acting Commissioner of Customs and Border Protection; Kenneth T. Cuccinelli, the Senior Official Performing the Duties of the Director of U.S. Citizenship and Immigration Services; and Andrew Davidson, the Acting USCIS Asylum Division Chief. *Id.* ¶¶ 112–18.

Plaintiffs claim that the new policies are unlawful under the Administrative Procedure Act, 5 U.S.C. §§ 553, 706(2), because they are contrary to law, arbitrary and capricious, and the Department of Homeland Security ("DHS") failed to employ appropriate notice and comment procedures in enacting them. Second Am. Compl. ¶¶ 174–82, 189–93. Plaintiffs also claim that the new procedures are unconstitutional because they do not afford the necessary due process to non-citizens and violate their rights under the First and Fifth Amendments. *Id.* ¶¶ 183–88. Plaintiffs seek equitable relief in the form of an order enjoining defendants from issuing expedited removal orders and continuing to apply the new policies and procedures, as well as a declaratory judgment stating that the new policies are contrary to law. *Id.* at 66–67, Prayer for Relief.

Plaintiffs moved for a temporary restraining order on September 25, 2019. Pls.' First Mot. for TRO [Dkt. # 13] ("Pls.' First TRO Mot."). Defendants opposed the motion, Defs.' Mem. in Opp. to Pls.' First TRO Mot. [Dkt. # 26] ("Defs. Opp. to First TRO Mot."), and they moved to dismiss the case in part for lack of subject matter jurisdiction on February 14, 2020. Defs.' Partial Mot. to Dismiss [Dkt. # 72] ("Defs.' Mot."). For the reasons stated below, defendants' partial motion to dismiss will be granted.

It is worth noting at the outset that this case is not about illegal immigrants. It is about women and children who have travelled great distances, under extraordinarily difficult

circumstances, to request legal admission to this country of immigrants through the long-standing process of applying for asylum, and it is brought against the backdrop of the ongoing efforts of the current administration to erect new barriers to their entry and possibly close the door entirely. But as the plaintiffs in this case have consistently emphasized, this particular lawsuit is not the lawsuit challenging the Transit Ban. And this more limited lawsuit presents numerous complex jurisdictional issues under the Illegal Immigration Reform and Immigrant Responsibility Act, which places substantial limitations on the availability of judicial review. Therefore, even though the majority of the claims and the claimants will be dismissed, nothing in this opinion should be read as expressing any point of view about the lawfulness or the reasonableness of the ban itself, or the legitimacy of any unwritten policies related to its implementation.

## BACKGROUND

### Statutory and Regulatory Framework

The current asylum system was established by the Refugee Act of 1980, Pub. L. 96-212, 95 Stat. 102. The law was intended to implement the principles agreed to in the 1951 United Nations Convention Relating to the Status of Refugees, July 28, 1951, 189 U.N.T.S. 150 ("Refugee Convention"), and the 1967 United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, 606 U.N.T.S. 267. *Negusie v. Holder*, 555 U.S. 511, 535 (2009); Second Am. Compl. ¶ 119. The Refugee Convention established the principle of "non-*refoulement*"; the signatories agreed that "[n]o Contracting State shall expel or return (*refouler*) a refugee in any manner whatsoever to the frontiers of territories where his [or her] life or freedom would be threatened on account of his

[or her] race, religion, nationality, membership of a particular social group or political opinion."[1] Refugee Convention, art. 33(1), 189 U.N.T.S. 150.   According to plaintiffs, the principle guarantees "procedural safeguards that prohibit removal or return of non-citizens to countries where their life or liberty may be threatened," Second Am. Compl. ¶ 124, citing *INS v. Stevic*, 467 U.S. 408, 426 (1984), and it was codified as part of the Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, div. G, Title XXII, § 2242, 112 Stat. 2681, 2681–822 (1998) (codified as Note to 8 U.S.C. § 1231).

Plaintiffs assert that pursuant to the Refugee Act, before 1996, non-citizens were generally entitled to a full hearing in immigration court before they could be removed.   Second Am. Compl. ¶ 125.   They were also entitled to administrative appellate review before the Board of Immigration Appeals ("BIA") and judicial review in federal court.   *Id.*   In 1996, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act, which established a truncated removal mechanism called "expedited removal" in which a non-citizen who has not been admitted or paroled into the United States, and who lacks valid entry documentation or makes material misrepresentations, shall be "order[ed] . . . removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under [8 U.S.C. § 1158] or a fear of persecution."   8 U.S.C. § 1225(b)(1)(A)(i); *see* Second Am. Compl. ¶ 126.   If an individual does not indicate a credible fear or intention to apply for asylum, a final order of expedited removal may be entered against the non-citizen.   *Id.* § 1225(b)(1)(A)(i).   But if an

---

1       The United States adopted the 1967 Protocol Relating to the Status of Refugees, which incorporates the Refugee Convention's prohibition on *refoulement*.   Second Am. Compl. ¶ 122 n.7, citing 1967 Protocol Relating to the Status of Refugees, art. 1(1) & 7(1) (stating that signatories "undertake to apply articles 2 to 34 inclusive of the [Refugee] Convention" without reservation).

individual makes such an indication, he or she must undergo a "credible fear" interview. *See id.* § 1225(b)(1)(B)(ii).

To prevail at a credible fear interview, the applicant must show that there is a "significant possibility" that he or she could establish the well-founded fear of persecution necessary to be eligible for asylum under 8 U.S.C. § 1158. 8 U.S.C. §1225(b)(1)(B)(v). For that, "it need not be shown that the situation will probably result in persecution, but it is enough that persecution is a reasonable possibility." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 440 (1987), quoting *Stevic*, 467 U.S. at 424–25. An objective showing that an applicant has even a ten percent chance of being shot, tortured, or persecuted can be a basis for the well-founded fear. *Id.*

The law provides certain procedural protections for those undergoing credible fear interviews. The asylum officer must "conduct the interview in a non-adversarial manner." 8 C.F.R. § 208.30(d). Asylum officers typically conduct the credible fear interviews, and Congress has required these officers to have "professional training in country conditions, asylum law, and interview techniques comparable to that provided to full-time adjudicators." 8 U.S.C. § 1225(b)(1)(E); *see also* 8 C.F.R. § 208.1(b). The asylum officer must "consider whether the alien's case presents novel or unique issues that merit consideration in a full hearing before an immigration judge." 8 C.F.R. 208.30(e)(4). Furthermore, the interviewee is entitled to "information concerning the asylum interview" (i.e., what process and standards apply) and to "consult with a person or persons of the alien's choosing prior to the interview or any review." 8 U.S.C. § 1225(b)(1)(B)(iv).

If the asylum officer determines that the non-citizen has established a credible fear, the applicant is taken out of the expedited removal process. *See* 8 U.S.C. § 1225(b)(1)(B)(ii). He or she will be referred to a regular removal hearing under § 1229a, before an immigration judge,

where there will be an opportunity to develop a full record and appeal an adverse decision to the BIA and a federal court. *See id.* § 1252(a)(1). If the asylum officer determines there is no credible fear, and a supervisory asylum officer reviews and approves the negative credible fear determination, 8 C.F.R. § 208.30(e)(8), the individual can request review of that decision by an immigration judge. 8 U.S.C. § 1225(b)(1)(B)(iii)(III). If the immigration judge agrees that the non-citizen lacks a credible fear, then that individual may be removed, and the decision may not be appealed. 8 C.F.R. § 1208.30(g)(2)(iv)(A).

On July 16, 2019, the Department of Justice and Department of Homeland Security jointly published "Asylum Eligibility and Procedural Modifications," which became effective immediately. 84 Fed. Reg. 33,829 ("Transit Ban"). The regulation provides, with limited exceptions, that a non-citizen "who enters or arrives in the United States across the southern land border is ineligible for the discretionary benefit of asylum unless he or she applied for and received a final judgment denying protection in at least one third country through which he or she transited en route to the United States." *Id.* at 33,831. The rule requires asylum officers and immigration judges to apply this new bar on asylum eligibility when administering the credible fear screening process applicable to stowaways and non-citizens who are subject to expedited removal. *Id.* at 33,830. Plaintiffs allege that after the rule was promulgated, defendants implemented directives, guidance, actions and/or procedures that have "eviscerated the 'credible fear' process." Second Am. Compl. ¶ 1.

While the rule states that it "does not change the credible-fear standard for asylum claims," an individual subject to the Transit Ban "would be ineligible for asylum and would thus not be able to establish a 'significant possibility . . . [of] eligibility for asylum under Section 1158.'" 84 Fed. Reg. 33,837, quoting 8 U.S.C. § 1225(b)(1)(B)(v) (alterations in original). But the

individual may still obtain review from an immigration judge regarding whether the asylum officer correctly determined that he or she was subject to a limitation or suspension on entry imposed by the Transit Ban. *Id.*

The new rule provides that "[a]liens determined to be ineligible for asylum by virtue of falling subject to the third-country-transit bar . . . would still be screened, but in a manner that reflects that their only viable claims could be for statutory withholding or [Convention Against Torture ("CAT")] protection pursuant to 8 C.F.R. 208.30(e)(2)–(4) and 1208.16." 84 Fed. Reg. 33,837. In other words, after an applicant is determined to be ineligible for asylum because he or she is subject to the Transit Ban, the asylum officer must then assess whether "further proceedings on a possibly statutory withholding or CAT protection claim are warranted," which imposes the higher "reasonable fear" standard, rather than the "credible fear" standard. *Id.*

To establish a "reasonable fear" of persecution or torture, the non-citizen must "establish a reasonable possibility that he or she would be persecuted on account of his or her race, religion, nationality, membership in a particular social group or political opinion, or a reasonable possibility that he or she would be tortured in the country of removal." 8 C.F.R. § 208.31(c). "This . . . screening process is modeled on the credible fear screening process, but requires the alien to meet a higher screening standard." Regulations Concerning the Convention Against Torture, 64 Fed. Reg. 8,478, 8,485 (Feb. 19, 1999).

In this action, plaintiffs have expressly disclaimed any challenge to the Transit Ban. Second Am. Compl. ¶ 6 n.4; *see* Order [Dkt. # 15]. It is the subject of separate litigation pending in this court. *See Capital Area Immigrants' Rights Coalition v. Trump*, Civil Action No. 19-2117 (D.D.C. 2019); *I.A. v. Barr*, Civil Action No. 19-cv-2530 (D.D.C. 2019). The purpose of this lawsuit is to challenge the legality of policies that were promulgated to implement the Transit Ban,

which, according to the plaintiffs, have unfairly and illegally altered the process that should be utilized to evaluate fear.  *See* Second Am. Compl. ¶ 6 n.4

### Factual Background

Plaintiffs are mothers and children who have traveled from their home countries to the United States, each claiming to have escaped incidents of sexual and physical violence or threats of violence.  Second Am. Compl. ¶¶ 12–111.  They have been detained at the South Texas Family Residential Center in Dilley, Texas.  *Id.*

Plaintiffs allege that defendants have issued eleven directives, policies, or procedures that have unlawfully altered the credible-fear determination process.  Second Am. Compl. ¶¶ 141–59.  Collectively, plaintiffs refer to these as the "Challenged Actions," and they have assigned each action a name for purposes of this litigation because they have not yet uncovered documents that identify or memorialize them.  *Id.* ¶ 147 n.10.

The eleven challenged actions, in plaintiffs' words,[2] are:

**1.     "Avoid Meaningfully Orienting Migrants to Applicable Standard and Procedures."  Second Am. Compl. ¶ 147.**

Plaintiffs allege that they have been deprived of any notice of the asylum process, and that they were not informed of the procedures that would be followed, who would be conducting the interviews, how their responses could affect their status, and the standard by which their claims would be assessed.  Second Am. Compl. ¶ 147.

---

2     Plaintiffs' list is grammatically inconsistent and awkward, but to ensure that this opinion tracks the complaint accurately, the Court will utilize plaintiffs' language without revisions.

### 2.    "Proceed Without Required Staffing, Training, or Guidance." Second Am. Compl. ¶ 148.

Plaintiffs allege that defendants have implemented a new policy of proceeding with credible fear interviews without proper staffing and training.  Second Am. Compl. ¶ 148.  They allege that interviewers have not received the appropriate or required training, including training to assess whether non-citizens fall within exceptions to the Transit Ban.  *Id.*  Defendants have also started to use Customs and Border Patrol ("CBP") agents to conduct asylum interviews, and plaintiffs allege that these agents lack the necessary training to perform that function.  *Id.*

### 3.    "Issue Summary Negative Determinations to Eliminate Supervisory Review and Concurrence and to Avoid Developing a Complete Written Record."  Second Am. Compl. ¶ 149.

Plaintiffs allege that "[d]efendants have truncated the fact development and discussion of the merits in [p]laintiffs' fears in interviews, unilaterally determining that [p]laintiffs are ineligible for asylum."  Second Am. Compl. ¶ 149.  According to the complaint, defendants announce negative determinations prematurely, sometimes directly to an applicant during the interview, intimidating and discouraging plaintiffs from asserting their rights.  Furthermore, plaintiffs allege that they have been denied the right to have a record created that would accurately memorialize the fear of persecution they expressed.  *Id.*  Finally, plaintiffs complain that they are denied the right to supervisory review of the determination.  *Id.*

### 4.    "Limit Fact-Finding Relevant to a Significant Possibility of Eligibility for Asylum, Withholding of Removal, and Relief Under the Convention Against Torture."  Second Am. Compl. ¶ 150.

Plaintiffs allege that defendants have improperly limited the interviewers' questioning, "so they fail to elicit testimony necessary to develop all facts relevant or supportive of an asylum-seeker's eligibility for asylum, withholding of removal, and CAT protection."  Second Am. Compl.

¶ 150. This results in an incomplete evidentiary record, which prejudices applicants' present and future petitions. *Id.*

**5.    "Make Interviews Adversarial."  Second Am. Compl. ¶ 151.**

Plaintiffs allege that interviewers have engaged in "law enforcement-type interrogation tactics" during interviews.  For example, they say that applicants are interviewed multiple times by multiple officers, sometimes over a few weeks.  Second Am. Compl. ¶ 151.  In addition, plaintiffs assert that the interviews conducted by CBP agents are adversarial, because the agents are law enforcement officers.  *Id.* ¶ 152.  The complaint alleges that these tactics create a "hostile interview environment that chills the testimony of credible fear applicants."  *Id.* ¶ 153.

**6.    "Limit Migrants' Right to Meaningful Consultation."   Second Am. Compl. ¶ 154.**

Plaintiffs allege that defendants schedule interviews without sufficient advance written notice, which leaves them unable to consult with counsel or an advisor in a meaningful way. Second Am. Compl. ¶ 154.

**7.    "Apply [Reasonable Fear Interview ("RFI")] Standards Without RFI Protections."  Second Am. Compl. ¶ 155.**

The complaint asserts that individuals subject to a reasonable fear interview under 8 U.S.C. § 1231 have a right to receive (1) advance written notice of the interview, (2) in-person orientation by an asylum officer at least 48 hours in advance of the interview, and (3) access to counsel during a proceeding conducted by a properly trained asylum agent.  Second Am. Compl. ¶ 155.  Plaintiffs allege that while they were initially placed in credible fear proceedings under 8 U.S.C. § 1225, the interviewers would issue summary determinations of ineligibility and then "subject [p]laintiffs to an RFI-type evaluation and determination, continuing the initial interview but now applying the

higher RFI standard."  *Id.*  According to plaintiffs, this deprived them of the protections required

for RFI interviewees.  *Id.*

**8.   "Do Not Apply the Most Favorable Precedent in [Credible Fear Interview ("CFI")] Proceedings."  Second Am. Compl. ¶ 156.**

Plaintiffs allege that interviewers are rejecting the most favorable case law available to be

applied in credible fear proceedings, and that this approach "ignores the permanent injunction in

*Grace v. Whitaker*, 344 F. Supp. 3d 96 (D.D.C. 2018), which requires the asylum officer to apply

the most favorable circuit court precedent in credible fear proceedings, regardless of where an

asylum-seeker is detained."  Second Am. Compl. ¶ 156.

**9.   "Mandatory Concurrence Review by the Fraud Detection Unit."  Second Am. Compl. ¶ 157.**

Plaintiffs allege that defendants have implemented a policy that requires that any credible

fear finding made in an applicant's favor be further reviewed by USCIS's Fraud Detection and

National Security Directorate.  Second Am. Compl. ¶ 157.  Plaintiffs contend that this has "resulted

in mandatory rescission of the overwhelming majority of cases sent for review," and they assert

that this action "appears directed at arbitrarily limiting the number of families placed in credible

fear proceedings that can obtain positive determinations."  *Id.*

**10.   "Withholding Facts Relied Upon in Issuing the Credible Fear Determination."  Second Am. Compl. ¶ 158.**

An asylum officer is required to create a written record of his or her determination,

including a summary of all material facts stated by the applicant and any additional facts relied

upon.  Second Am. Compl. ¶ 158.  Plaintiffs allege that interviewers are now not recording critical information relied upon when issuing a negative determination.  *Id.*

**11.     Abandon Child-Sensitive Treatment in Credible Fear Proceedings." Second Am. Compl. ¶ 159.**

Plaintiffs allege that interviewers have required some credible fear screenings to be conducted via telephone, which precludes the officers from applying "child-friendly procedures during the interview process."   Second Am. Compl. ¶ 159.   The telephonic interviews are "adversarial" and "crossover to interrogations" and plaintiffs have been deprived of "necessary accommodations related to their age and status as asylum-seekers traveling in a family unit."  *Id.*

\*     \*     \*

In sum, plaintiffs allege that these eleven Challenged Actions have effectively rewritten the expedited removal scheme, depriving them of their rights and exposing them to grave danger in their home countries.  Second Am. Compl. ¶¶ 166–71.

The complaint advances five theories in support of the request for relief:

- Claim 1:  The challenged actions are contrary to the Refugee Act, the Immigration and Nationality Act, and the Administrative Procedure Act. *Id.* ¶¶ 174–78.

- Claim 2:  The challenged actions are arbitrary and capricious, in violation of the Administrative Procedure Act, 5 U.S.C. § 706.  *Id.* ¶¶ 179–82.

- <u>Claim 3</u>:  The challenged actions violate the First Amendment and the due process clause of the Fifth Amendment.[3]  *Id.* ¶¶ 183–88.

- <u>Claim 4</u>:  The challenged actions did not undergo the notice-and-comment procedures required by the Administrative Procedure Act.  *Id.* ¶¶ 189–93.

- <u>Claim 5</u>:  The challenged actions fail to provide the necessary procedural safeguards, in violation of the right of non-*refoulement*.  *Id.* ¶¶ 194–200.

Plaintiffs ask the Court to declare that the challenged actions are contrary to law, to enter an order vacating the actions, to permanently enjoin defendants from applying the new policies, and to enjoin defendants from removing plaintiffs until they can reprocess plaintiffs' fear claims in accordance with the law.  *Id.* at 66–67, Prayer for Relief.  Plaintiffs have also filed two motions for a Temporary Restraining Order that would stay plaintiffs' removals from the United States until the case is resolved.  Pls.' First TRO Mot.; Pls.' Second Mot. for TRO [Dkt. # 29] ("Pls.' Second TRO Mot.").

## Procedural History

On September 16, 2019, plaintiffs filed their initial complaint.  Compl. [Dkt. # 1].  The case was originally assigned to another district judge because defendants filed a notice, pursuant to Local Civil Rule 40.5(b)(2), stating that the case was related to two other pending cases directly

---

3       In Count 3, plaintiffs also allege that defendants "violated [p]laintiffs['] rights under the First Amendment . . . by retaliating against [p]laintiffs for their participation in this case." *Id.* ¶ 187; *see id.* ¶ 172 (defendants "have engaged in coercive, intimidating, and apparently retaliatory actions that burden, impair, and threaten [p]laintiffs for their participation in this case"). In the next paragraph of that Count, plaintiffs state:

> The above Challenged Actions must *therefore* be enjoined and declared as violative of the First Amendment and/or the Fifth Amendment's guarantee of due process, and also held declared and held unlawful, set aside, or otherwise vacated and/or enjoined under the APA . . . .

*Id.* ¶ 188 (emphasis added).  Thus, it is clear that plaintiffs are challenging the Challenged Actions, and there is no separate claim for relief based upon retaliation.

challenging the legality of the Transit Ban – *Capital Area Immigrants' Rights Coalition v. Trump*, Civil Action No. 19-2117 (D.D.C. 2019), and *I.A. v. Barr*, Civil Action No. 19-2530 (D.D.C. 2019).  *See* Notice of Related Case [Dkt. # 3]; Notice of Related Case [Dkt. # 4].  Plaintiffs disputed the designation.  Pls.' Resp. to Notices of Related Case [Dkt. # 5].

On September 25, 2019, while the court considered whether the case should be designated as related, plaintiffs moved for a temporary restraining order to stay the removal of plaintiffs from the United States until the court had an opportunity to rule on the merits of the complaint.  Pls.' First TRO Mot.  That same day, the court concluded that defendants failed to demonstrate that the case was related to the two challenging the Transit Ban, because plaintiffs disavowed any intent to challenge the Transit Ban in their complaint.   Order [Dkt. # 15] at 2 (reassigning case). Accordingly, the case was sent back to the Court's Calendar and Case Management Committee for random assignment.  *Id.* at 4.  Before that process was complete, the emergency motions judge issued an order entering a temporary administrative stay to preserve the status quo until a new judge was assigned to the matter and that judge could determine whether temporary injunctive relief was warranted.  *See* Order Granting Temporary Stay [Dkt. # 16].

On September 26, 2019, the case was assigned to this Court.  The Court conducted a telephonic hearing with the parties and established a briefing schedule for the motion for a temporary restraining order.  Min. Entry (Sept. 26, 2019).  On October 3, 2019, defendants opposed the motion for a TRO, Defs.' Opp. to First TRO Mot., and plaintiffs filed a reply on October 10, 2019.  Pls.' Reply in Supp. of Pls.' First TRO Mot. [Dkt. # 27].  Thereafter, the prompt resolution of the motion was repeatedly complicated by the addition of new plaintiffs, plaintiffs' restatement and refinement of their claims, and the parties' requests to file supplemental pleadings.  While the matter is now fully briefed, the requests to expand the lawsuit to include hundreds of additional

14

immigrants and detainees facing deportation – not always under the same circumstances as the original plaintiffs – have continued to multiply.

On October 17, 2019, plaintiffs filed an amended complaint adding thirty-one plaintiffs to the action, Am. Compl. [Dkt. # 28], and a second temporary restraining order to stay their removal. Pls.' Second TRO Mot.   The emergency motions judge, on behalf of the Court, extended the administrative stay in place to apply to the new plaintiffs.  Min. Order (Oct. 17, 2019).  Defendants opposed the second motion for a temporary restraining order on October 24, 2019.  Defs.' Mem. in Opp. to Second TRO Mot. [Dkt. # 35].

On December 5, 2019, plaintiffs filed a motion for leave to file a second amended complaint, which plaintiffs asserted narrowed their claims, removed some plaintiffs, and added clarification and citations.   Mem. in Supp. of Mot. for Leave to File Second Am. Compl. [Dkt. # 46-3] ("Pls.' Mot. for Leave") at 3–5.  The same day, plaintiffs filed a motion for joinder to add 110 plaintiffs, and they included a request for leave to file an "alternate proposed Second Amended Complaint" if the motion was granted.  Pls.' Mot. to Add Plaintiffs [Dkt. # 47]; *id.* at 1. Plaintiffs also filed an emergency motion to extend the administrative stay to the proposed additional plaintiffs, Pls.' Emergency Mot. [Dkt. # 48], which the emergency motions judge granted.  Order [Dkt. # 50].  On December 13, 2019, defendants informed the Court of their consent to the motion for joinder and the motion for leave to file a second amended complaint, Defs.' Resp. [Dkt. # 53], and the Court granted plaintiffs' motions.  Min. Order (Dec. 16, 2019).

On December 18, 2019, the Court heard oral argument on the motion for temporary restraining order.  Min. Entry (Dec. 18, 2019).  Defendants filed a supplemental memorandum in support of their opposition to the TROs on December 27, 2019, Defs.' Suppl. Mem. in Opp. to Pls.' First TRO Mot. [Dkt. # 59] ("Defs.' Suppl. TRO Mem."), and plaintiffs filed a supplemental

memorandum on January 13, 2020.  Pls.' Suppl. Mem. in Supp. of their Mot. for TRO [Dkt. # 65] ("Pls.' Suppl. TRO Mem.").

At the time the complaint was filed, plaintiffs fell into three categories:  (1) individuals whose negative credible fear determinations had been vacated by an immigration judge and were no longer in expedited removal proceedings; (2) individuals whose negative credible fear determinations were currently pending before an immigration judge; and (3) individuals whose negative credible fear determinations had been affirmed by an immigration judge and who had received a final order of removal.  Pls.' Resp. to Order to Show Cause [Dkt. # 31].  Thus, for some of the plaintiffs, the case had become moot, for others, it was arguably not yet ripe, and others fell squarely within the group seeking an injunction.  In a series of filings designed to address these issues, fifty-five of the plaintiffs were voluntarily dismissed, including all of the plaintiffs in the first category.  *See* Notices of Voluntary Dismissals [Dkt. ## 25, 30, 33, 37, 38, 44]; Pls.' Suppl. to Court's Order to Show Cause. [Dkt. # 55].  On December 19, plaintiffs notified the Court that there was a fourth category of plaintiff who did not fall within any of the other three categories either because they were not detained, they had been placed into proceedings without review by an immigration judge, or they "[t]ook [v]oluntary [d]ismissal to be [r]emoved."  Ex. 4 to Pls.' Suppl. to Court's Order to Show Cause [Dkt. # 55-4].  In response to questions that came up at the motions hearing, plaintiffs also notified the Court on January 3, 2020 that twenty-one of the plaintiffs were not subject to the Transit Ban,[4] but all other plaintiffs who had been joined in the matter as of that time were subject to the ban.  Notice of Filing [Dkt. # 63].

---

4    Plaintiffs state that eight individuals had been wrongfully deemed to be subject to the Transit Ban; they did not cross through a third country en route to the United States but their paperwork indicates that the Transit Ban was applied to them.  Ex. C to Notice of Filing [Dkt. # 63-3].

On February 14, 2020, defendants filed a partial motion to dismiss based on lack of subject matter jurisdiction.  Defs.' Mot.  They argued that Congress expressly deprived the courts of jurisdiction over plaintiffs' claims in 8 U.S.C. § 1252(a)(2)(A)(iv).  Defs.' Mem. in Supp. of Defs.' Mot. ("Defs.' Mem.") at 10–11.  They also took the position that the Court did not have jurisdiction to review ten out of the eleven policies under 8 U.S.C. § 1252(e)(3), the provision relied upon by the plaintiffs to support jurisdiction, because there was no written record of the policies and/or because the claims were untimely.  *Id.* at 11–28.  Finally, they maintained that only some of the plaintiffs had standing to challenge the one remaining policy.  *Id.* at 28–29.  Plaintiffs opposed the motion on February 28, 2020.  Pls.' Opp. to Defs.' Mot. [Dkt. # 73] ("Pls.' Opp.").  They argued that the ban on judicial review in § 1252(e)(3) does not apply, and that the Court has federal question jurisdiction under 28 U.S.C. § 1331 in any event.  *Id*.

Since defendants filed their motion to dismiss, plaintiffs have filed five more motions for joinder to add plaintiffs and five emergency motions to extend the administrative stay to the proposed plaintiffs.  *See* First Mot. for Joinder [Dkt. # 78] ("First Joinder Mot."); Emergency Mot. to Stay Removal of Proposed Pls.' [Dkt. # 79]; Second Mot. for Joinder [Dkt. # 86] ("Second Joinder Mot."); Emergency Mot. to Stay Removal of Proposed Additional Pls. [Dkt. # 85]; Third Mot. for Joinder of Proposed Additional Pls. [Dkt. # 88] ("Third Joinder Mot."); Emergency Mot. to Stay Proposed Additional Pls. [Dkt. # 89]; Fourth Mot. for Joinder to Add Pls. [Dkt. # 91] ("Fourth Joinder Mot."); Emergency Mot. to Stay Removal of Proposed Additional Pls. [Dkt. # 92]; Fifth Mot. for Joinder [Dkt. # 94] ("Fifth Joinder Mot."); Emergency Mot. to Stay Removal of Proposed Additional Pls. [Dkt. # 95].  Defendants have opposed the joinder motions. Defs.' Opp. to First Joinder Mot. [Dkt. # 83]; Defs.' Opp. to Second and Third Joinder Mots. [Dkt. # 90].

Because the Court had the preliminary jurisdictional issues under advisement, it needed time to consider the merits of the joinder motions, and the deportation of the proposed additional plaintiffs was imminent, the Court granted the emergency motions to stay removal of the proposed additional plaintiffs until the Court could rule on the joinder motions.  *See* Min. Order (Mar. 25, 2020); Min. Order (Apr. 4, 2020); Min. Order (Apr. 6, 2020); Min. Order (Apr. 15, 2020); Min. Order (Apr. 23, 2020).  Those motions will be denied for the reasons set forth below.

## STANDARD OF REVIEW

In evaluating a motion to dismiss under Rule 12(b)(1), the Court must "treat the complaint's factual allegations as true and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'"  *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (internal citation omitted), quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979); *see also Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011), quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005) (applying principle to Rule 12(b)(1) motion).  Nevertheless, the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions.  *Food & Water Watch Inc. v. Vilsak*, 808 F.3d 905, 913 (D.C. Cir. 2015).

Under Rule 12(b)(1), the plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *Shekoyan v. Sibley Int'l Corp.*, 217 F. Supp. 2d 59, 63 (D.D.C. 2002).  Federal courts are courts of limited jurisdiction, and the law presumes that "a cause lies outside this limited jurisdiction."  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *see also Gen. Motors Corp. v. EPA*, 363 F.3d 442, 448 (D.C. Cir. 2004) ("As a court of limited jurisdiction, we begin, and end, with

an examination of our jurisdiction."). "[B]ecause subject-matter jurisdiction is 'an Art[icle] III as well as a statutory requirement . . . no action of the parties can confer subject-matter jurisdiction upon a federal court.'" *Akinseye v. District of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003), quoting *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982).

When considering a motion to dismiss for lack of jurisdiction, unlike when deciding a motion to dismiss under Rule 12(b)(6), the court "is not limited to the allegations of the complaint." *Hohri v. United States*, 782 F.2d 227, 241 (D.C. Cir. 1986), *vacated on other grounds*, 482 U.S. 64 (1987). Rather, "a court may consider such materials outside the pleadings as it deems appropriate to resolve the question [of] whether it has jurisdiction to hear the case." *Scolaro v. D.C. Bd. of Elections & Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000), citing *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992); *see also Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

## ANALYSIS

### I.   Jurisdiction under the Illegal Immigration Reform and Immigrant Responsibility Act

Plaintiffs contend their claims are not barred by the jurisdiction-limiting provision found in the Illegal Immigration Reform and Immigrant Responsibility Act, 8 U.S.C. § 1252(a)(2)(A)(iv), and that the Court has federal question jurisdiction under 28 U.S.C. § 1331 because the claims "uniformly allege that [d]efendants' actions violate either the Constitution or federal statutes." Pls.' Opp. at 1, 6. Second, plaintiffs argue that if the Court concludes that the

statutory provision limiting jurisdiction does apply, it should find that the case falls within the exception to that limitation set out in 8 U.S.C. § 1252(e)(3).  *Id.* at 21.

### A.  The Statutory Limit on Judicial Review in § 1252(a)(2)(A)(iv)

Under 28 U.S.C. § 1331, federal district courts have jurisdiction over "all civil actions arising under the Constitution, law, or treaties of the United States."  But Congress may curtail that grant of jurisdiction "by establishing an alternative statutory scheme for administrative and judicial review."  *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 754 (D.C. Cir. 2019).  Defendants contend that 8 U.S.C. § 1252(a)(2)(A) restricts the Court's jurisdiction in this case.  Defs.' Mem. at 11.

Section 1252(a)(2)(A) states:

(2)  Matters not subject to judicial review

> (A)   Review relating to section 1225(b)(1) Notwithstanding any other provision of law . . . , no court shall have jurisdiction to review –
>
>> (i) except as provided in subsection (e), any individual determination or to entertain any other cause or claim arising from or relating to the implementation or operation of an order of removal pursuant to section 1225(b)(1) of this title,
>>
>> (ii) except as provided in subsection (e), a decision by the Attorney General to invoke the provisions of such section,
>>
>> (iii) the application of such section to individual aliens, including the determination made under section 1225(b)(1)(B) of this title, or
>>
>> (iv) except as provided in subsection (e), procedures and policies adopted by the Attorney General to implement the provisions of section 1225(b)(1) of this title.

8 U.S.C. § 1252(a)(2)(A).

Defendants' motion to dismiss turns on the applicability of the fourth subparagraph, which divests the Court of jurisdiction to review – with certain exceptions – "procedures and policies

adopted by the Attorney General." Plaintiffs argue that the provision does not apply because there are two reasons to find that the procedures and policies they challenge were not "adopted by the Attorney General."[5] Pls.' Opp. at 9. They submit first that Kenneth T. Cuccinelli, Senior Official Performing the Duties of the Director of USCIS ("Acting Director"), was not lawfully appointed, so any policies he adopted were without authorization and lack force and effect. *Id.* at 10; *see* Second Am. Compl. ¶ 117. Second, they argue that, to the extent any of the Challenged Actions stem from directives, policies, guidance or procedures that were not reduced to writing, such unwritten and unauthorized actions cannot be said to have been "adopted." Pls.' Opp. at 10.[6]

Plaintiffs point to a ruling by another court in this district that Acting Director Cuccinelli's appointment was unlawful, and that two written policies he promulgated must therefore be set aside. *L.M.-M. v. Cuccinelli*, Civ. A. No. 19-2676, 2020 WL 985376 (D.D.C. Mar. 1, 2020). But in that case, the plaintiffs predicated their challenge on the Federal Vacancies Reform Act ("FVRA"), 5 U.S.C. § 3345 *et seq.*, and the court determined that Cuccinelli's appointment was not consistent that statute. 2020 WL 985376, at *1, *25. The FVRA prescribed the remedy:

---

5      Since 2003, after the creation of the Department of Homeland Security, the language has referred to the Director of USCIS rather than the Attorney General personally. *See* Homeland Security Act of 2002, Pub. L. 107-296, § 451(b)(3), 116 Stat. 2135, 2196 (2002), codified at 6 U.S.C. § 271(b)(3) (giving USCIS authority over asylum applications); *id.* § 456(a)(1), 116 Stat. at 2200, codified at 6 U.S.C. § 275(a)(1) (deeming all federal laws related to functions transferred to USCIS as giving authority to the Director of USCIS rather than the individuals specified in the text); *id.* § 1517, 116 Stat. at 2311, codified at 6 U.S.C. § 557 (references to officials whose functions were transferred to DHS are "deemed to refer to the Secretary, other official, or component of [DHS] to which" the function was transferred). On June 10, 2019, defendant Kenneth T. Cuccinelli assumed the role of "Senior Official Performing the Duties of the Director of USCIS," and he acted as the Director for the relevant time period.

6      This contention is somewhat inconsistent with plaintiffs' assertion that the policies *were* reduced to writing, and that is why they fall within the exception to the ban on judicial review. *See* Pls.' Opp. at 40.

Cuccinelli's actions were without "force and effect."   5 U.S.C. § 3348(d)(1).  But whether Acting Director Cuccinelli had the authority to promulgate policies affects the validity of the policies; it does not bear on the question of the Court's power to review them.  Indeed, the court in *L.M.-M.* addressed jurisdiction separately; it exercised its jurisdiction to strike down certain written policies, but with respect to unwritten policies, it found that 8 U.S.C. § 1252(a)(2)(A)(iv) applied, and it did not have jurisdiction to review an unwritten policy even though it was attributed to Cuccinelli.  *Id*. at *11.  This Court agrees that it must first determine whether it has jurisdiction to review the Challenged Actions at all, and that the allegedly unlawful nature of Acting Director Cuccinelli's appointment does not relieve it of its obligation to consider the applicability of § 1252(a)(2)(A)(iv) as Congress intended.

Plaintiffs' second argument – that, to the extent the policies are unwritten, they have not been "adopted" and do not fall within § 1252(a)(2)(A)(iv) – is at odds with the statute.   Plaintiffs point to the Merriam-Webster's Collegiate Dictionary definition, which says that the meaning of "adopt" is "to accept formally and put into effect."  Pls.' Opp. at 17, quoting Merriam-Webster's Collegiate Dictionary 16 (10th ed. 1999).  They submit that unwritten policies have not been "accept[ed] formally."  *Id*.  But a policy can certainly be "adopted" without being reduced to writing, and the provision itself does not include the word "formally" or any other narrowing term.

To the extent the plain text of the provision is in some way ambiguous, the Court is required look at the term within the structure and context of the statute.  *Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302, 320 (2014).  Here, is clear that in enacting this statute, Congress knew exactly how to differentiate between written and unwritten policies when it intended to do so. Section 1252(a)(2)(A)(iv) precludes judicial review unless § 1252(e)(3) applies, and that exception states:

22

> Judicial review of determinations under section 1225(b) of this title . . . shall be limited to determinations of . . . (ii) whether such regulation, or a *written* policy directive, *written* policy guideline, or *written* procedure issued by or under the authority of the Attorney General to implement such section, is not consistent with applicable provisions of this subchapter or is otherwise in violation of the law.

§ 1252(e)(3)(A)(ii) (emphasis added).   The repetition of the adjective in a subsequent section of the same statute suggests that if the word "adopted" was supposed to mean "written," the legislature would have been more explicit.

Thus, the Court finds that § 1252(a)(2)(A)(iv) limits subject matter jurisdiction in this action.   The next question to be determined, then, is whether plaintiffs' claims fall within the exception to the preclusion of judicial review found in § 1252(e)(3).

## B.   The Availability of the § 1252(e)(3) Exception to the Ban on Judicial Review

Section 1252(e)(3) allows judicial review on "[c]hallenges on validity of the system."   It states:

> (A) In general

> Judicial review of determinations under section 1225(b) of this title and its implementation is available in an action instituted in the United States District Court for the District of Columbia, but shall be limited to determinations of –

>> (i) whether such section, or any regulation issued to implement such section, is constitutional; or

>> (ii) whether such a regulation, or a written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General to implement such section, is not consistent with applicable provisions of this subchapter or is otherwise in violation of law.

> (B) Deadlines for bringing actions

> Any action instituted under this paragraph must be filed no later than 60 days after the date the challenged section, regulation, directive, guideline, or procedure described in clause (i) or (ii) of subparagraph (A) is first implemented.

23

8 U.S.C. § 1252(e)(3).

Defendants argue first that most of the Challenged Actions are not regulations or "written" policies, so the exception in section 1252(e)(3)(A) does not supply jurisdiction.  Defs.' Mem. at 11–22.  Second, defendants contend that plaintiffs have brought their claims outside of the sixty-day deadline in subparagraph B.  *Id.* at 22–28.  Finally, defendants argue that some plaintiffs do not have standing to challenge at least one of the alleged policies.  *Id.* at 28–29.

### 1.   Unwritten Challenged Actions

The gravamen of plaintiffs' complaint is that the practices they challenge are being regularly applied, and they ask the Court to conclude from that circumstance that they must have been written down.  Pls.' Opp. at 30–31.  Defendants assert that seven out of the eleven challenged actions do not appear in any regulation, written policy directive, written guideline, or written procedure, and therefore the Court cannot review them.  Defs.' Mem. at 13.

Defendants have submitted the affidavit of Ashley B. Caudill-Mirillo, the Deputy Chief of the Asylum Division of the U.S. Citizenship and Immigration Services, who avers that a search of agency records revealed no written directives related to the actions alleged in the complaint.  Decl. of Ashley B. Caudill-Mirillo, Ex. 1 to Defs.' Suppl. TRO Mem. [Dkt. # 59-1] ("Caudill-Mirillo Decl.") ¶¶ 1, 21–34; Suppl. Decl. of Ashley B. Caudill-Mirillo, Ex. 1 to Defs.' Mem. [Dkt. # 72-2] ("Suppl. Caudill-Mirillo Decl.") ¶¶ 1, 4.  To search for materials memorializing the eleven alleged policies, she consulted with staff in the Asylum Division's three headquarters that would have knowledge about such policies:  the Operations Branch, the Training Branch, and the Fraud Detection and National Security ("FDNS") Branch.  Suppl. Caudill-Mirillo Decl. ¶ 3.  She also consulted with the staff at the Houston Asylum Office, which oversees the South Texas Family Residential Center in Dilley, Texas.  *Id.*  She explains:

> The headquarters branches are led by branch chiefs who manage the subject matter experts, who are primarily asylum officers and FDNS immigration officers. These staff members oversee, operationalize or implement the Asylum Division's training and operations that were relevant to the challenged actions as described in Plaintiffs' complaint, and were well-positioned to ascertain what existing policies potentially aligned with the names and descriptions provided by Plaintiffs for the purported policies.

*Id.* Ms. Caudill-Mirillo also states that she or her staff searched and reviewed the Asylum Division's electronic shared drives and e-mail for records of the policies, and she "verified dates and procedures relating to USCIS Asylum Division policies that affect how credible fear determinations were made at the South Texas Family Residential Center." *Id.*[7]

Based on this search, Ms. Caudill-Mirillo declares that there are no writings related to the following policies:

---

[7]     This is the sort of affidavit, that in the FOIA context, would be entitled to a "presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'" *Safecard Svcs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991), quoting *Ground Saucer Watch, Inc. v. CIA*, 692 F.2d 770, 771 (D.C. Cir. 1981). While this not a FOIA case, and the Court is not applying any evidentiary presumption, plaintiffs have not pointed to any other locations where defendants should have looked, nor do they point to any other specific defects in the declarant's efforts. *See* Pls.' Opp. at 30–31. They simply argue that "there is little reason to credit [d]efendants' characterization of what records exist." *Id.* at 33–34.

Defendants submitted Caudill-Mirillo's first declaration in opposition to plaintiffs' motion for a TRO. In response, plaintiffs took the position that the declaration lacked sufficient detail, and they complained that the declarant has "never worked at CBP, does not testify to ever visiting the Dilley facility or having personal knowledge of any interviews there, or otherwise testify to being personally involved in any events resulting in the Challenged Actions." Pls.' Suppl. TRO Mem. at 24–25. Because the declaration is being considered in connection with the question of whether the challenged policies have been written down, and not whether they have actually been implemented at any particular facility, Caudill-Mirillo's lack of personal experience at Dilley is of little moment. The supplemental declaration addressed plaintiffs' objections to the description of the search by identifying the locations searched and the individuals and offices consulted. Suppl. Caudill-Mirillo Decl. ¶ 3. Caudill-Mirillo declared that she oversees "all Asylum Officers nationwide as well as the Asylum Division's headquarters component, which is involved in policy development, quality assurance, and overall management of the asylum program," *id.* ¶ 1, and she appears to be the appropriate person to address whether USCIS has promulgated or adopted the written policies alleged in the complaint.

- Challenged Action # 3:  "Issue Summary Negative Determinations to Eliminate Supervisory Review and Concurrence and to Avoid Developing a Complete Written Record."  Second Am. Compl. ¶ 149; *see* Caudill-Mirillo Decl. ¶ 26.

- Challenged Action # 4:  "Limit Fact-Finding Relevant to a Significant Possibility of Eligibility for Asylum, Withholding of Removal, and Relief Under the Convention Against Torture."  Second Am. Compl. ¶ 150; *see* Caudill-Mirillo Decl. ¶ 27.

- Challenged Action # 5:  "Make Interviews Adversarial."  Second Am. Compl. ¶ 151; *see* Caudill-Mirillo Decl. ¶ 28.

- Challenged Action # 7:  "Apply RFI Standards Without RFI Protections."  Second Am. Compl. ¶ 155; *see* Caudill-Mirillo Decl. ¶ 30.

- Challenged Action # 8:  "Do Not Apply the Most Favorable Precedent in CFI Proceedings."  Second Am. Compl. ¶ 156; *see* Caudill-Mirillo Decl. ¶ 31.

- Challenged Action # 10:  "Withholding Facts Relied Upon in Issuing the Credible Fear Determination." Second Am. Compl. ¶ 158; *see* Caudill-Mirillo Decl. ¶ 33.

- Challenged Action # 11:  "Abandon Child-Sensitive Treatment in Credible Fear Proceedings."  Second Am. Compl. ¶ 159; *see* Caudill-Mirillo Decl. ¶ 34.

Defs.' Mem. at 13–14.  Defendants argue, then, that plaintiffs are not challenging "written policy directives," but they are objecting to the manner in which USCIS Asylum Officers have gone about reaching their determinations, which is not reviewable under 8 U.S.C. § 1252(e)(3)(A)(ii).  *Id.* at 13.

Plaintiffs respond that "there is . . . no reason to accept the government's representation that no relevant writings exist" because plaintiffs have produced thirty-one exhibits "summarizing uniform changes in the credible fear process that constitute the Challenged Actions."  Pls.' Opp. at 30–31, citing Suppl. Decl. of Shalyn Fluharty [Dkt. # 67] ("Suppl. Fluharty Decl.") ¶¶ 41–42, 52–53, 101–05.   They contend that because these actions have been implemented "near

universally" after the Transit Ban went into effect, there must be some sort of written record of them. *Id.* at 31.

Plaintiffs have submitted the declaration of Shalyn Fluharty, the managing attorney of the Dilley Pro Bono Project ("DPBP").   Suppl. Fluharty Decl. ¶ 3.   She has provided direct representation to those detained at the South Texas Family Residential Center, and she is familiar with what is taking place on the ground and the tactics that are being employed.  *Id.* ¶¶ 3, 5.  Her declaration lists examples of occasions when plaintiffs experienced the Challenged Actions, and from this, plaintiffs ask the Court to conclude that the written policies must exist.   But an assumption – even an assumption grounded in good faith based on actual experience – is not the proof necessary to invoke the statutory exception.   Plaintiffs have not come forward with the evidence needed to bridge the gap between instances of certain conduct – or even an apparently consistent or settled practice – and the existence of a *written* directive calling for that conduct. And it is plaintiffs' burden to establish jurisdiction.  *Lujan*, 504 U.S. at 561.

For example, for Challenged Action # 5, which asserts that asylum officers have now made interviews adversarial, plaintiffs assert that "[n]early overnight," CBP agents started conducting interviews, Suppl. Fluharty Decl. ¶ 52; interviews were conducted telephonically, *id.* ¶ 53; interviews were conducted by men, *id.*; and some applicants were forced to undergo multiple interviews.[8]  Second Am. Compl. ¶ 151.  They allege that "some of the CBP agents who have conducted credible fear interviews . . . have publicly announced their belief that" gender-based

---

[8]    Defendants acknowledge that CBP agents or asylum officers have conducted multiple interviews on some occasions when further questioning was needed, or when interpreter availability, attorney reschedule requests, or other "operational necessities" called for a second session.  Caudill-Mirillo Decl. ¶ 15.  In any event, defendants maintain that there is no written policy to conduct multiple interviews, or to do so to "make interviews adversarial."  Defs.' Mem. at 14–15, and plaintiffs have not submitted any evidence to the contrary.

violence is acceptable, and immigrants should be prevented from entering the United States, and they attach troubling social media postings by CBP agents who have interviewed at least thirteen plaintiff families. *Id.* ¶¶ 55–58. This is the sort of showing that undermines confidence in the fairness and legitimacy of the immigration process, but the Court is constrained by the clear legislative restriction on its jurisdiction. Even if one accepts the truth of every allegation – as one must do at this stage – the allegations involve precisely the sort of conduct that the Court is unable to supervise – the conduct of specific CBP agents and asylum officers – and it does not establish the existence of a written policy subject to review.

The same problem arises with respect to Challenged Actions ## 8, 10, and 11. For Challenged Action # 8, "do not apply the most favorable precedent," Ms. Fluharty states that "many [p]laintiffs . . . are denied the benefit of the most favorable case law," Suppl. Fluharty Decl. ¶ 83, and she identifies an instance in which favorable circuit precedent was not applied, and the decision maker relied on more restrictive Fifth Circuit law instead. *Id.* ¶ 84. Defendants submit that USCIS remains in full compliance with the permanent injunction issued in *Grace v. Whitaker,* 344 F. Supp. 3d 96 (D.D.C. 2018), which requires an asylum officer to apply the most favorable precedent regardless of where the interview is taking place. Defs.' Mem. at 16. Even if plaintiffs have identified occasions in which the officers have fallen short of the defendants' blanket assurances, that is not evidence that they have been directed to do so in writing.

For Challenged Action # 10, which alleges that defendants have a policy of withholding facts relied upon in issuing credible fear determinations, plaintiffs submit that a majority of the them were never served with a written analysis explaining the decision, and those who were served with paperwork often found it to be incomplete or defective. Suppl. Fluhary Decl. ¶¶ 98–100. These facts support an inference that there are serious deficiencies in the implementation of

existing regulations requiring adequate documentation, but that circumstance also falls outside the limited set of matters the statute accords the Court the ability to review.

For Challenged Action # 11, the declaration enumerates instances in which asylum officers and CBP agents did not engage meaningfully with some of the children during fear interviews. Suppl. Fluharty Decl. ¶ 103.  Plaintiffs report that agents are now conducting interviews by telephone, which interferes with an agent's ability to develop any sort of rapport with the child.[9] *Id.* ¶ 104.  Plaintiffs' concerns that the interviewers have abandoned best practices, to the detriment of the youngest and most vulnerable people who arrive at our country's border, appear to be well documented.  But Congress has tied the Court's hands behind its back.  It is not condoning any of the challenged actions, but it is restricted in its authority to review them without evidence of a written instrument putting them into place.

With respect to Challenged Action # 4, which alleges that asylum officers limit the fact-finding relevant to the credible fear standard, Ms. Fluharty avers that she has seen "officers ignore relevant testimony . . . and refuse to elicit and document material and necessary testimony to properly assess" the applicant's credible fear.  Suppl. Fluharty Decl. ¶ 45.  She also provides examples of interviews in which asylum officers did not ask appropriate follow-up questions in what she observed to be an effort to avoid developing the factual record fully.  *Id.* ¶ 46.  The lawyer states that before the Transit Ban was implemented, ninety-nine percent of individuals served by the DPBP received positive credible fear findings, but now, that number has decreased to ten

---

9       Defendants' declarant avers, and plaintiffs do not point to proof to the contrary, that there is no rule prohibiting credible fear interviews to be conducted by telephone, and the decision to conduct an interview by telephone is driven by operational factors, including space and availability of officers at the detention facility.  Caudill-Mirillo Decl. ¶ 34.

percent.  *Id.* ¶¶ 48–49.   According to plaintiffs, then, this must mean that there is some sort of policy in place to limit asylum eligibility.  *See* Pls.' Opp. at 30–31.

But plaintiffs' approach blurs the distinction between the obvious purpose and effect of the Transit Ban itself – which they are not challenging in this case, *see* Second Am. Compl. ¶ 6 n.4. – and what they need to show to obtain judicial review here:  the existence of written policies for implementing the ban.   An overall reduction in positive credible fear findings is consistent with rule itself, because an individual subject to the Transit Ban "would be ineligible for asylum and would thus not be able to establish a 'significant possibility . . . [of] eligibility for asylum under section 1158," which is the standard for finding credible fear.   84 Fed. Reg. at 33,837, quoting INA 235(b)(1)(B)(v), 8 U.S.C. § 1225(b)(1)(B)(v) (alteration in original).   Since the overwhelming majority of plaintiffs in this action were subject to the Transit Ban, this evidence in the declaration is insufficient to establish the likely existence of a written policy.

This problem also affects Challenged Actions # 3 and # 7.   For Challenged Action # 3, the allegation that officers are summarily issuing negative determinations during the interviews, plaintiffs' declarant states that in one hundred percent of plaintiffs' cases, the plaintiff was informed that she would be issued a negative credible fear finding before a supervisor could review the asylum officer's determination.   Suppl. Fluharty Decl. ¶ 42.   She also avers that eighty-one percent of the mothers in this action were informed, during the interview and before they had the opportunity to present testimony regarding their fear of persecution and torture, that they would receive a negative credible fear finding.  *Id.* ¶ 41.   But the Transit Ban automatically bars migrants from establishing credible fear if they do not fall within one of the exceptions in the rule, so the

Challenged Action stems directly from the application of the Ban.[10]  Challenged Action # 7,  which alleges that interviewers apply reasonable fear standards without reasonable fear protections, similarly challenges a circumstance imposed by the Transit Ban itself because the new rule explicitly directs asylum officers to apply the reasonable fear standard if the Transit Ban applies. 84 Fed. Reg. at 33,837.  These provisions may be subject to challenge, but they are part and parcel of the Ban, and they are not a part of this narrowly crafted lawsuit that is supposed to be about something else.

The Court concludes, therefore, that it lacks jurisdiction to review Challenged Actions ## 3, 4, 5, 7, 8, 10, and 11, because they do not fall within the exception to the ban on judicial review contained in § 1252(e)(3)(A)(ii).

Plaintiffs resist this conclusion and argue that a bar on review of unwritten policies would mean that actions by asylum officers are effectively unreviewable, which would be an unconstitutional result that Congress could not have intended.  Pls.' Opp. at 18–21.  In *American Immigration Lawyers Association v. Reno* ("*AILA*"), 18 F. Supp. 2d 38 (D.D.C. 1998), *aff'd* 199 F.3d 1352 (D.C. Cir. 2000), the court was faced with a similar argument:  "To the extent [plaintiffs] challenge unwritten practices, which [§ 1252(e)(3)(A)(ii)] does not allow, plaintiffs argue that Congress cannot limit review of unwritten policies because this would mean that possibly unconstitutional action by immigration officials would not be reviewable by a court – a result that Congress could not have intended."  *Id.* at 58.  The court stated that it was "troubled by the effects of Congress's decision to immunize the unwritten actions of an agency from judicial review,

---

10     Even if this challenged action is not a challenge to the Transit Ban, plaintiffs have not satisfied their burden to come forward with evidence of a written policy or written directive memorializing the practice of issuing summary negative determinations at the outset or in the middle of an interview.

particularly where, as here, so much discretion is placed in the hands of individual INS agents." *Id.* And in its opinion, it took pains, "in the strongest language possible, [to] admonish[ ] the Immigration and Naturalization Service to comply with its own regulations, policies, and procedures." *Id.* Yet the court concluded that the "clear language of the jurisdictional provision" meant that the court could not review unwritten policies and practices. *Id.*

This Court shares the concerns expressed by the court in *AILA* that the facts amassed by the plaintiffs are deeply troubling, and that Congress has been too parsimonious with judicial review in an area where individual lives and liberty are at stake. But like the other district courts that have considered the issue, this Court is constrained to find that it does not have jurisdiction to review the Challenged Actions. *See L.M.-M.*, 2020 WL 985376, at *11 (finding that the Court did not have jurisdiction to review an unwritten policy); *Khan v. Holder*, 608 F.3d 325, 331 (7th Cir. 2010) (upholding the district court's ruling that while it could review regulations "as written," it could not review them "as applied," and agreeing with the lower court's concern "with the effects of Congress's decision to bar the unwritten actions of the agency from judicial review").

### 2. The Four Remaining Challenged Actions

Defendants maintain that there are no written directives memorializing any of the four remaining Challenged Actions – ## 1, 2, 6, and 9 – either, but they have located some documents that may pertain to them. *See* Defs.' Reply at 2–3. They do not agree that these records are sufficient to establish the existence of written policies behind all of the actions, and they submit that even if the records confirm the existence of the policies plaintiffs intend to challenge, and the documents bring the four claims within the exception to the bar on judicial review, the Court lacks jurisdiction to hear the claims because they are untimely.

Under § 1252(e)(3)(B), "[a]ny action instituted under this paragraph must be filed no later than 60 days after the date the challenged section, regulation, directive, guideline, or procedure . . . is first implemented." 8 U.S.C. § 1252(e)(3)(B). This is not a discovery rule: the D.C. Circuit has held that the sixty days begin on the "effective date" of the regulation or written policy. *Am. Immigration Lawyers Ass'n v. Reno*, 199 F.3d 1352, 1355 (D.C. Cir. 2000), affirming *AILA*, 18 F. Supp. 2d at 47 (holding that the sixty days runs from a fixed point, rather than "from the date of application of [the challenged procedures] to a particular alien," such that when an alien's claims arise is irrelevant). The Court of Appeals has also concluded that the sixty-day bar is jurisdictional.[11] 199 F.3d at 1355; *see Dugdale*, 2015 WL 2124937, at *1.

Challenged Action # 1 alleges that officials at the border avoid meaningfully orienting migrants to applicable standard and procedures. Second Am. Compl. ¶ 147. Defendants have located the following documents that relate to migrant orientation: (1) a 1999 version of Form M-444, which is provided to a non-citizen before an interview and describes the process and standards involved, Ex. 1 to Suppl. Caudill-Mirillo Decl. [Dkt. # 72-2] ("1999 M-444 Form"); and (2) the version of the M-444 form updated in May of 2019. Ex. 2 to Suppl. Caudill-Mirillo Decl. [Dkt. # 72-2] ("2019 M-444 Form"). Plaintiffs argue that the May 2019 form became outdated and inaccurate on July 16, 2019, the day the Transit Ban took effect, and that the continued use of the form violates federal law requiring agents to "provide information concerning the asylum

---

11      Plaintiffs contend that the time bar is not jurisdictional, and so it is subject to equitable tolling. Pls.' Opp. at 36–37. It cites to Supreme Court case *United States v. Kwai Fun Wong*, 575 U.S. 402 (2015) for support. *Id.* at 36. In that case, the Court held that there is a presumption that filing deadlines, including deadlines for suits against the United States, are subject to equitable tolling. 575 U.S. at 408. But, the Supreme Court's holding in *Wong* was limited to the Federal Tort Claims Act, and so "*AILA* remains binding precedent in this Circuit." *Dugdale v. U.S. Customs and Border Patrol*, Civ. A. No. 14-1175 (CRC), 2015 WL 2124937, at *1 (D.D.C. May 6, 2015), *aff'd Dugdale v. Lynch*, 672 F. App'x 35 (D.C. Cir. 2016).

interview" to all interviewees.  Pls.' Opp. at 23–24, citing 8 U.S.C. § 1225(b)(1).  In other words, plaintiffs submit that the now inaccurate form is a writing, and that the sixty days to challenge its use began on the date defendants should have updated it.  Defendants deny that there was any new policy – much less, a written policy – regarding the continued use of the Form M-444.  Defs.' Reply at 12–13.

While one can craft a lawyerly argument that this circumstance could be deemed to fall within § 1252(e)(3)(A)(ii), at bottom, the claim is not predicated on a written policy, but it is a challenge to a governmental failure to act:  a claim that an omission is tantamount to a decision not to provide meaningful information as a matter of policy.  That becomes clear when one focuses on the date the plaintiffs allege the new written policy was "implemented": according to plaintiffs, it is the date that the government should have updated its form.  But even if that failure to act had the effect of depriving migrants of accurate information – and even if that was intentional – there is no *written* directive or decision to continue to utilize, or to decline to revise, the outdated form. Therefore, even if a challenge would have been timely with respect to the original set of plaintiffs, there is no evidence of a "regulation, or [ ] written policy directive, written policy guideline, or written procedure issued" that the Court can review.  8 U.S.C. § 1252(e)(3)(A)(ii).

As for Challenged Action # 6, which claims that defendants now limit migrants' right to meaningful consultation with counsel, Second Am. Compl. ¶ 154, defendants identified the following related documents:

> (1) a July 2, 2019 memorandum issued by Kenneth Cuccinelli, explaining that effective July 8, 2019, USCIS would reduce the credible fear consultation period from 72 hours for Family Residential Centers and 48 hours for all other facilities to 24 hours for both, Ex. 1 to Caudill-Mirillo Decl. [Dkt. # 59-1] ("July 2 Memo");

(2) a July 8, 2019 email calling for the immediate implementation of the July 2 Memo, Ex. 2 to Caudill-Mirillo Decl. [Dkt. # 59-1] ("July 8 Email");

(3) the form with which an asylum seeker can waive the consultation period, Ex. 3 to Suppl. Caudill-Mirillo Decl. [Dkt. # 72-2]; and

(4) an "Updated Credible Fear Procedures Manual" reflecting the reduction of the consultation period to 24 hours.  Ex. 4 to Suppl. Caudill-Mirillo Decl. [Dkt. # 72-2].

But plaintiffs have specifically disclaimed any challenge to the shortening of the time available for consultation.  *See* Pls.' Opp. at 22.[12]  So these documents do not bear on Challenged Action # 6 as plaintiffs have defined it.  Rather, plaintiffs contend that this action pertains to defendants scheduling interviews "without sufficient advance written notice" which leaves them unable to consult with counsel or an advisor in a meaningful way.[13]  Second Am. Comp. ¶ 154. So these documents do not bear on Challenged Action # 6, and plaintiffs do not point to any other records memorializing any other policy that bears on the right to consultation.

Defendants have also located documents related to Challenged Action # 2, which alleges that the officers conducting the asylum interviews have not been adequately trained, Second Am. Compl. ¶ 148:

(1) a Memorandum of Agreement between the U.S. Customs and Border Protection (CBP) and U.S. Citizenship and Immigration Services (USCIS),

---

[12]    In any event, a September 16, 2019 claim challenging the truncated consultation period would have been untimely, because the memorandum became effective on July 8, 2019.  *See* July 8 Email; *see also L.M.-M.*, 2020 WL 985376 at *10.  And, the directive has already been set aside by another court in this district.  *L.M.-M.*, 2020 WL 985376, at *25 (vacating the policy due to defects in Acting Director Cuccinelli's appointment).

[13]    In plaintiffs' opposition to the motion to dismiss, they group together challenged actions # 6 and # 7, and generally describe how asylum officers move from the credible fear standard to the reasonable fear standard without proper procedural protections.  *See* Pls.' Opp. at 32.  As stated in the previous section, this is a challenge to the Transit Ban itself, and is not appropriately within this litigation.

signed on July 10, 2019, Ex. 4 to Caudill-Mirillo Decl. [Dkt. # 59-1] ("July MOA");

(2)  an updated Memorandum Agreement between CBP and USCIS, signed on January 30, 2020, Ex. 10 to Suppl. Caudill-Mirillo Decl. [Dkt. # 72-2]; and

(3)  a "Distance Training Component Workbook" updated in December 2019, Ex. 9 to Suppl. Caudill-Mirillo Decl. [Dkt. # 72-2], which defendant avers is part of "[t]raining agendas for the cohorts of Border Patrol Agents." Suppl. Caudill-Mirillo Decl. ¶ 8.

Defendants' declarant averred that the first cohort of Border Patrol Agents completed training in May of 2019 and conducted credible fear interviews from June 5, 2019 to June 20, 2019. *Id.* Then, "[b]etween June 20, 2019 and July 11, 2019, CBP and USCIS developed the [July] Memorandum Agreement." *Id.* She stated that after the July MOA was signed, "Border Patrol Agents resumed conducting interviews on July 15, 2019. After being trained, Border Patrol Agents began conducting interviews at the South Texas Family Residential Center in Dilley, on or about September 9, 2019." *Id.* This memorandum sets forth that CBP agents designated to conduct asylum interviews shall, among other things: receive training to meet the statutory definition of "asylum officer," use telephonic services to conduct interviews, conduct interviews in a non-adversarial manner, and take notes and prepare a summary of material facts stated by the applicant. July MOA at 2–3.

Plaintiffs have alleged that CBP agents have not been adequately trained to conduct asylum interviews (Challenged Action # 2), that they have made the interviews unduly "adversarial," (Challenged Action # 5) and that conducting interviews by phone has precluded the use of "child-sensitive" techniques (Challenged Action # 11). Second Am. Compl. ¶¶ 148, 151, 159. But plaintiffs' challenges to the government's written decision to assign CBP officers to perform the asylum interview function is untimely. The clock started to run on July 10, 2019, when the MOA

36

was signed by both parties and became effective.  July MOA at 4 ("This agreement is effective upon signature by both Parties.").

Plaintiffs submit that the date the agreement was executed should not control for purposes of § 1252(e)(3)(B) because the administration could avoid legal challenges by "keep[ing] new procedures secret for at least 60 days."  Pls.' Opp. at 35.  Here, even if one were to assume that the date the policy became public was the "date of implementation" for purposes of the statutory deadline, plaintiffs' claim would still be untimely here because CBP agents resumed conducting interviews – and therefore, their role was known – on July 15.  Suppl. Caudill-Mirillo Decl. ¶ 8. Plaintiffs point out that CBP agents had not yet conducted interviews at Dilley or completed their training to do so before September.  Pls.' Opp. at 28.  But the jurisdictional time limit does not begin to run when a written policy is applied in a particular geographical region or to particular individuals; this Court is bound by Circuit precedent to conclude that the sixty days begins upon "first implementation," that is, the first date the policy became effective.  *AILA*, 199 F.3d at 1355. Thus, the claim is untimely.

Finally, with respect to Challenged Action # 9, the requirement that any positive determination be reviewed by the USCIS Fraud Detection and National Security Directorate, Second Am. Compl. ¶ 151, the government's declarant has identified the date of first implementation as August 30, 2019.  *See* Caudill-Mirillo Decl. ¶ 32.  Defendants therefore concede that the Court has jurisdiction to hear this claim as it was brought by the plaintiffs named in the original complaint.  Defs. Mem. at 27.  But they argue that the Court does not have jurisdiction

over the ninety-eight plaintiffs[14] added to the second amended complaint, which was filed on December 5, 2019, or to anyone who has sought joinder thereafter. *See id.* The Court agrees, and therefore all of the plaintiffs added to the second amended complaint must be dismissed.

Plaintiffs contend that because some of the plaintiffs have standing to assert a challenge to this action, then it does not matter that others were added outside of the jurisdictional time limit. Pls.' Opp. at 22. But compliance with the time limit is a jurisdictional issue that is distinct from constitutional standing, and in *AILA*, the D.C. Circuit affirmed the district court's dismissal of two plaintiffs who were joined to the complaint after the statutory sixty-day deadline had passed, even though there were plaintiffs in the action who had filed their claims on a timely basis. 199 F.3d at 1356–57. Thus, since the challenge to action # 9 is the only one remaining under § 1252(e)(3)(A), the Court must limit the case to those plaintiffs who brought their claims in accordance with § 1252(e)(3)(B), and it will dismiss the plaintiffs added on December 5, 2019 or thereafter.

## II.    Article III Standing and Joinder under Federal Rules of Civil Procedure 20 and 21

Defendants also move to dismiss some plaintiffs on the grounds that they do not have Article III standing to bring a claim challenging action # 9. Defs.' Mem. at 28–29. Defendants' declarant has averred that out of all the named plaintiffs, only twenty-six individuals, consisting

---

14      Plaintiffs originally added 110 plaintiffs with the second amended complaint but twelve of them have voluntary dismissed their claims. *See* Pls.' Second Suppl. to Their Resp. to Order to Show Cause [Dkt. # 55], Notice of Voluntary Dismissal [Dkt. # 71]; Notice of Voluntary Dismissal [Dkt. # 93].

of twelve family units, were subject to the Fraud Detection review.[15]  Eight of those twenty-six

plaintiffs have voluntarily dismissed their claims.  *See* Notice of Voluntary Dismissal [Dkt. # 25]

(dismissing D.V.R., A.V.R., I.S.R., and J.A.S.); Notice of Voluntary Dismissal [Dkt. # 30]

(dismissing N.C.A. and M.P.C.); Notice of Voluntary Dismissal [Dkt. # 44] (dismissing D.S.P.

and V.V.P.).  Thus, defendants state, those who were not subject to review by the Fraud Detection

Unit did not suffer an injury-in-fact, Defs.' Mem. at 29, which is required to establish constitutional

standing.  *Lujan*, 504 U.S. at 560–61.

Defendants back away from this argument in their reply, conceding that "[p]laintiffs are

correct that Article III's case-or-controversy requirement is satisfied if one plaintiff can establish

injury and standing."  Defs.' Reply at 10, citing *J.D. v. Azar*, 925 F.3d 1291, 1323 (D.C. Cir. 2019)

("In that event, it is immaterial that other plaintiffs might be unable to demonstrate their own

standing."); *see also Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 53 n.2

(2006); *Bowsher v. Synar*, 478 U.S. 714, 721 (1986).  However, defendants maintain that the Court

should still dismiss these plaintiffs because they are no longer properly joined to the action.  Defs.'

Reply at 10–11.

The Court agrees.  Now that the lawsuit has been narrowed to consist of a single claim

challenging the written requirement that a positive fear determination must be subjected to a Fraud

Detection review, individuals who have not had favorable determinations overturned due to that

---

15      Those plaintiffs are:  N.C.A., and minor child, M.P.C.; D.V.R, and minor child A.V.R.; I.S.R., and minor child J.A.S; I.A.D., and minor child C.L.A.; S.A.C., and minor child V.H.A.; Y.E.S. and minor child M.I.E.; A.C.B. and minor child A.C.B.; D.G.A., and minor children E.P.G. and M.P.G.; D.S.P. and minor child V.V.P.; C.P.G. and minor child M.B.P.; W.P.R. and minor children H.C.P. and J.C.P.; M.C.D. and minor child E.E.C.  Suppl. Caudill-Mirillo Decl. ¶ 10; *see* Caudill-Mirillo Decl. ¶ 32 (stating that cases at the South Texas Residential Center were reviewed by FDNS Branch from August 30 to November 7, 2019).

allegedly unlawful process are no longer properly joined in the case.  Federal Rule of Civil

Procedure 20 states that

> Persons may join in one action as plaintiffs if:
>
>> (A) they assert any right to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and
>>
>> (B) any question of law or fact common to all plaintiffs will arise in the action.

Fed. R. Civ. P. 20(a)(1).  "Prong one of Rule 20(a) is satisfied when the court concludes that the

[p]laintiffs' claims are 'logically related.'" *Umbert v. United States*, No. 18-CV-1336, 2019 WL

4305576, at *7 (D.D.C. Sept. 11, 2019), quoting *Disparte v. Corp. Executive Bd.*, 223 F.R.D. 7,

10 (D.D.C. 2004).  "Prong two is satisfied if there is 'some common question of law or fact in the

plaintiffs' claims, [although] not all issues have to be common to all plaintiffs.'"  *Id.*, quoting

*Montgomery v. STG Int'l Inc.*, 532 F. Supp. 2d 29, 35 (D.D.C. 2008) (alterations in original).

Federal Rule of Civil Procedure 21 states that while "misjoinder of parties is not a ground

for dismissing an action," the court may "[o]n motion or on its own . . . on just terms, add or drop

a party." Fed. R. Civ. P. 21.  This rule allows the Court to dismiss a party if they do not meet the

requirements set forth in Rule 20.  *M.K. v. Tenet*, 216 F.R.D. 133, 137 (D.D.C. 2002) ("In

determining whether the parties are misjoined, the joinder standard of Federal Rule of Civil

Procedure 20(a) applies.").  Even when parties meet the requirements of Rule 20, Rule 21 permits

a court to sever specific parties from an action "upon a sufficient showing of prejudice to the

defendant, delay, or potential for jury confusion." *Sadat I. v. Nielsen*, Civ. A. No. 17-1976, 2019

WL 108854, at *4 n.7 (D.D.C. Jan. 4, 2019), quoting *Martinez v. DOJ*, 324 F.R.D. 33, 38 (D.D.C.

2018).

Because Challenged Action # 9 is the only remaining action, the plaintiffs who were not subject to review by the Fraud Detection Unit do not assert "any right to relief . . . arising out of the same transaction [or] occurrence." Fed. R. Civ. P. 20(a)(1)(A); *see Walsh v. Ford Motor Co.*, 130 F.R.D. 514, 515–16 (D.D.C. 1990) (finding that while all plaintiffs alleged they experienced a common problem with automobiles, plaintiffs did not show that issue was the result of a common defect, and thus the plaintiffs could not be properly joined in one action). While all plaintiffs ultimately received negative fear determinations, those who did not undergo review by the Fraud Detection Unit received them for unrelated reasons, and there is no longer any pending claim that would support the requested delay in the execution of their removal orders.

Thus, given the narrowing of the counts, the only plaintiffs who are properly joined now for purposes of a motion for temporary restraining order or a dispositive motion are those whose positive determinations were overturned pursuant to the Fraud Detection review. Those plaintiffs who were not subject to Fraud Detection review will be dismissed from the action.

## III.   Plaintiffs' Motions for Joinder

Since the filing of the second amended complaint and the addition of the third set of plaintiffs, plaintiffs have filed five motions for joinder seeking to add a host of other claimants. The first and second motions seek to add two family units consisting of seven migrants currently being housed at the Berks Family Residential Center in Leesport, Pennsylvania. First Joinder Mot. ¶ 1; Second Joinder Mot. ¶ 1. The third motion seeks to add six additional migrants who are currently being held at the South Texas Residential Center in Dilley, Texas. Third Joinder Mot. ¶ 1. The fourth motion for joinder seeks to add thirty individuals being held in both Pennsylvania and Texas. Fourth Joinder Mot. ¶¶ 1–10. Finally, the fifth motion seeks to add twenty-two individuals currently being held at the South Texas Residential Center. Fifth Joinder Mot. ¶¶ 1–

9.   The sixty-five proposed plaintiffs allege that they were subject at least seven of the alleged policies, but they make no claim that they were subject to the only claim that is moving forward – Challenged Action # 9.   *See* First Joinder Mot. ¶ 6; Second Joinder Mot. ¶ 8; Third Joinder Mot. ¶ 6; Fourth Joinder Mot. ¶ 13; Fifth Joinder Mot. ¶ 12.

As stated above, under Federal Rule of Civil Procedure 20, persons may join in one action as plaintiffs if:   "(A) they assert any right to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all plaintiffs will arise in the action." Fed. R. Civ. P. 20(a)(1).   "[J]oinder of claims, parties and remedies is strongly encouraged," *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 724 (1966), and the "policy underlying permissive joinder is to promote trial convenience and expedite the resolution of lawsuits." *Disparte*, 223 F.R.D. at 10, quoting *Puricelli v. CNA Ins. Co.*, 185 F.R.D. 139, 142 (N.D.N.Y. 1999).   Courts may also consider whether joining additional parties would prejudice any party or result in undue delay.   *See M.K.*, 216 F.R.D. at 138.

However, "[t]he Court's granting of a joinder motion does not resuscitate claims that are barred by the statute of limitations[,] [a]nd futility is grounds to deny a motion to join a plaintiff where the prospective plaintiffs' claims would not survive a motion to dismiss because of the statute of limitations." *Breen v. Chao*, 2018 WL 1509077, at *10 (D.D.C. Mar. 27, 2018) (internal citations and quotation marks omitted); *Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 794–95 (D.C. Cir. 1983) (finding that denial of the joinder motion was justified because such an action would be futile), citing *Foman v. Davis*, 371 U.S. 178, 182 (1962) (concluding that leave to amend pleadings need not be granted when such an action would be futile).

Applying those precedents, the motions for joinder will be denied, and the administrative stays extended to the proposed plaintiffs will be lifted, because the proposed plaintiffs' claims are well outside the sixty-day limitations period set forth in § 1252(e)(3)(B).[16] The motions for joinder were filed on March 25, April 3, April 6, April 14, and April 23, 2020 and as plaintiffs themselves have alleged, the challenged policies were being "implemented" before the first and second complaints were filed. Thus, joining the proposed plaintiffs' claims would be futile as the claims are untimely.[17]

Plaintiffs maintain that since Acting Director Cuccinelli had no authority to implement the alleged policies they are seeking to challenge, the sixty-day bar should not apply. First Joinder Mot. ¶ 7; Second Joinder Mot. ¶ 9; Third Joinder Mot. ¶ 7; Fourth Joinder Mot. ¶ 14; Fifth Joinder Mot. ¶ 13. But this is a non-sequitur; the Director's appointment may bear on the validity of

---

16     This was a questionable strategy. Reasons emphasized in some of the accompanying motions for stay, such as the fact that some migrants are now in quarantine, had nothing to do with the original case. Emergency Mot. to Stay Removal of Proposed Additional Pls. [Dkt. # 95] ¶ 2. The mere fact that the Court had stayed deportation in this case did not make this docket the appropriate vehicle for unlimited numbers of migrants to obtain similar relief for an unlimited period of time, particularly given the sixty-day restriction. The proposed additional plaintiffs and future claimants will need to file separate actions, based on other, viable grounds.

17     In their first motion for joinder, plaintiffs point out that if the sixty-day window applied to the migrants seeking to join the action, those potential plaintiffs "never had a window in which they could file," because defendants had argued in the past that other plaintiffs' claims were not yet ripe at the time they were filed. *See* First Joinder Mot. ¶ 5; *See* Defs.' Opp. to Pls.' First TRO Mot. (arguing that claims on behalf of plaintiffs who had not yet received negative credible fear determinations from an immigration judge were not ripe, and that the motion was premature as to them). While it is undeniable that these competing jurisdictional principles put plaintiffs in a bind, plaintiffs are mixing apples and oranges here: ripeness and mootness are principles affecting subject matter jurisdiction under Article III, and the sixty-day period is a firm legislative limitation on the Court's power to act that the Court has no equitable power to circumvent, even as new sets of migrants are subjected to the harshness of its terms.

43

policies he enacted, but it has no bearing on the restraints on judicial review imposed by Congress in § 1252(a)(2)(A) or the narrow scope of the exception for written policies in § 1252(e)(3).

## CONCLUSION

For all those reasons, defendants' partial motion to dismiss the second amended complaint will be granted, and plaintiffs' motions for joinder will be denied.

A separate order will issue.


AMY BERMAN JACKSON
United States District Judge

DATE:  April 27, 2020

44